# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

ROBERT UTTER and FAITH IRELAND, )
in the name of the STATE OF )
WASHINGTON, )
 )
Appellants, )
 )
 )
 )
v. )
 )
 )
 )
BUILDING INDUSTRY ASSOCIATION )
OF WASHINGTON, )
 )
 )
Respondent. )

No. 66439-5-I
Consolidated w/66737-8-I

ORDER GRANTING
RESPONDENT'S MOTION FOR
RECONSIDERATION, WITHDRAWING
OPINION FILED OCTOBER 29, 2012
AND SUBSTITUTING OPINION

On October 29, 2012, this court filed its unpublished opinion in the above-entitled action. Respondent/cross-appellant has moved for reconsideration. The court has taken the matter under consideration and has decided to grant the motion for reconsideration.

IT IS HEREBY ORDERED that the respondent/cross-appellant's motion for reconsideration is granted;

IT IS FURTHER ORDERED that the unpublished opinion of this court filed in the above-entitled action on October 29, 2012 be withdrawn and that the attached published opinion be substituted in its place.

Dated this 16th day of September, 2013.

_____ Spearman, A.C.J.

_____ Cox, J.

_____ Grosse, J.

**IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| ROBERT UTTER and FAITH IRELAND, in the name of the STATE OF WASHINGTON, | ) ) ) ) | No. 66439-5-I Consolidated w/No. 66737-8-I |
| Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| BUILDING INDUSTRY ASSOCIATION OF WASHINGTON, | ) ) ) | PUBLISHED OPINION |
| Respondent. | ) | FILED: <u>September 16, 2013</u> |

SPEARMAN, A.C.J. — Under the Fair Campaign Practices Act (FCPA), chapter 42.17A RCW, political committees are subject to certain registration and reporting requirements.[1] An organization is considered a political committee "by either (1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals." <u>Evergreen Freedom Found. v. Washington Educ. Ass'n</u>, 111 Wn. App. 586, 599, 49 P.3d 894 (2002) (<u>EFF</u>). These alternative means are the contribution prong and the expenditure prong, respectively. <u>Id</u>. at 598. In 2008, Robert Utter and Faith Ireland brought a citizen's action against the Building Industry Association of Washington (BIAW), asserting that it met the definition of a political committee under the contribution

---

[1] While the parties' briefs refer to the former statutes, all references in our opinion are to the recodified statutes as they appear in chapter 42.17A RCW.

prong and the expenditure prong through its support for Dino Rossi's 2008 gubernatorial campaign. Therefore, Utter and Ireland claimed, BIAW violated the FCPA by failing to register and report as a political committee. Before filing their lawsuit against BIAW, Utter and Ireland sent a notice of intent to the Washington State Attorney General's office (AG), stating that they would file a lawsuit against BIAW and BIAW-MSC for violations of the FCPA if the State did not. The AG referred the allegations to the Public Disclosure Commission (PDC) for investigation. Based on the PDC's conclusions, the AG filed a lawsuit against BIAW-MSC but did not file a lawsuit against BIAW.

On BIAW's motion for summary judgment, the trial court found there was no genuine issue of material fact in dispute and dismissed Utter and Ireland's lawsuit. It denied BIAW's request for attorney's fees. Utter and Ireland appeal from summary judgment and BIAW cross-appeals the denial of attorney's fees. We conclude that while the evidence creates an issue of material fact that BIAW was a political committee under the expenditure prong, Utter and Ireland's claim is barred by RCW 42.17A.765(4), where the AG caused their allegations to be investigated, determined BIAW was not a political committee, and did not file a lawsuit. Accordingly, we affirm. We also affirm the trial court's denial of attorney's fees to BIAW and do not award fees on appeal.

## FACTS

BIAW is a non-profit affiliate of the National Association of Home Builders (NAHB), whose mission is to promote the common interests of Washington's

building industry. It has approximately 13,500 members, primarily home builders. Members first join and pay dues to one of BIAW's fifteen local associations throughout the state, then automatically become members of BIAW and NAHB. Among other activities, BIAW does advocacy work in all branches of government, helps local associations recruit new members, runs an educational program, and organizes conferences. BIAW's sources of revenue include membership dues, income from interest and investments, health insurance fees, and fees from educational programs.

In 1993, BIAW created a wholly owned, for-profit subsidiary, BIAW Member Services Corporation (BIAW-MSC), to provide certain services to BIAW members. BIAW-MSC's primary function is to administer a worker's compensation insurance retrospective rating program ("retro program") pursuant to Department of Labor and Industries' rules.[2] BIAW-MSC generates revenue from the retro program from an up-front enrollment fee and from a back-end, incentive fee of 10 per cent of any refund earned by the program in a given year, referred to as a Marketing Assistance Fee (MAF). BIAW-MSC also runs other programs such as health insurance, life insurance, and educational seminars. It contributes a portion of its revenues to independent expenditures and to political action committees (PACs), such as ChangePAC. BIAW and BIAW-MSC share

---

[2] MSC was created to "'reduce the risk of tax liability for BIAW . . . for administering a for-profit retro program.'" Retro programs allow members to pool their worker's compensation risks and provide a chance for the pool to earn a refund of a portion of its premiums, when the group's combined claims are less than its premiums. See Washington Administrative Code (WAC) 296-17-90455.

3

the same leadership and staff, with staff salaries allocated between the entities based on the type of work performed. BIAW-MSC itself does not have any members.

By spring 2007, one of BIAW's main efforts was supporting Rossi's 2008 gubernatorial campaign. As part of this effort, BIAW senior officers requested the local associations to pledge excess MAF funds from their retro programs to support the campaign. Senior officers drafted a "Rossi-lution" that stated:

WHEREAS BIAW is committing 100% of excess retro dollars
to the 2008 gubernatorial election,

WHEREAS, participation of local associations is necessary
for success,
NOW THEREFORE BE IT RESOLVED THAT
The following local associations pledge that all Retro Marketing
Assistance funds received in 2007, beyond the amount budgeted
for the year, will be sent to the BIAW and placed in the BIAW 2008
gubernatorial election account, to be used for efforts in the 2008
gubernatorial race.

Eleven of the fifteen local associations agreed to participate in this effort, which ultimately raised $584,527.53.

On July 25, 2008 and September 9, 2008, in accordance with RCW 42.17A.765(4), Utter and Ireland sent notices of intent to the Washington State Attorney General (AG), stating that they would file a lawsuit against BIAW and BIAW-MSC for violations of the FCPA if the State did not. They claimed BIAW was legally responsible for violations of the FCPA, even though the independent expenditures in question were handled through the accounts of BIAW-MSC.

4

The AG referred Utter and Ireland's allegations to the Public Disclosure Commission (PDC), which completed an investigation and issued a report. The PDC determined that BIAW-MSC requested permission from the local associations to withhold a portion of the MAF funds and handled those portions of the withheld funds. On August 20, 2008, BIAW-MSC contributed from its general treasury fund $584,527.53—the amount raised from the MAF funds—to ChangePAC and provided ChangePAC a list of the 11 local associations and the amount contributed by each association. The next day, ChangePAC reported the receipt of the contributions as coming from the local associations.

The PDC report concluded:

> While [PDC] staff maintains the entire BIAW-MSC general fund would not be considered a political committee, the solicitation, receipt, and retention of local association Retro program refunds by BIAW-MSC in the amount of $584,527.53 qualifies that discrete portion of BIAW-MSC funds as a political committee pursuant to [RCW 42.17A.005(37)].

Based on the report, the PDC advised the AG that BIAW-MSC committed "multiple apparent violations of [RCW 42.17A] by failing to register as a political committee and report the contributions it solicited, received and retained from its local associations in 2007, and by failing to report expenditures to ChangePAC in 2008 with the contributions received." The report concluded that BIAW was not a political committee under RCW 42.17A.005(37). It found that during 2006 to June 2008, BIAW did not solicit or receive contributions to support or oppose candidates or ballot propositions, contribute to candidates or political committees,

or use its general treasury for other campaign-related expenditures. Accordingly, the report did not recommend action against BIAW.

On September 19, 2008, the AG filed a lawsuit against BIAW-MSC in superior court, alleging that BIAW-MSC was required to register as a political committee with respect to the MAF funds and to file PDC reports. The AG alleged that BIAW-MSC conducted an illegal fundraising campaign and violated RCW 42.17A.435 by concealing its solicitation and receipt of $584,527.53 in campaign contributions toward 2008 electoral activities. BIAW-MSC and the AG settled the lawsuit. As part of the settlement, BIAW-MSC agreed to file a political committee registration form and campaign finance disclosure reports with the PDC.

The AG did not file a lawsuit against BIAW. Utter and Ireland filed a lawsuit against BIAW on October 6, 2008 and filed an amended complaint on October 13. They claimed BIAW itself qualified as a political committee and was therefore required to register and report.[3] They asserted that although the transfers and expenditures at issue were processed through BIAW-MSC accounts, the evidence showed that BIAW "orchestrated the entire violation, made all decisions, and the parties making the illegal donations believed they were donating to the BIAW." They argued that the funds belonged to BIAW and/or its members and that BIAW-MSC was a "mere conduit" for them.

---

[3] Utter and Ireland also claimed that BIAW exceeded the campaign contribution limits under RCW 42.17A.405 and improperly coordinated with Dino Rossi. They voluntarily dismissed that claim and it is not at issue on appeal.

The BIAW filed a motion for summary judgment. The trial court granted BIAW's motion, finding there was no genuine issue of material fact in dispute and BIAW was entitled to judgment as a matter of law. Utter and Ireland appeal.

## DISCUSSION

Utter and Ireland contend the evidence creates a genuine issue of material fact that BIAW was a political committee under the contribution prong and the expenditure prong. BIAW responds that the entire activity forming the basis of Utter and Ireland's claims was conducted by BIAW-MSC. We agree with Utter and Ireland that the evidence creates an issue of fact under the expenditure prong. However, we conclude the AG's actions preclude Utter and Ireland's citizen action.[4]

### Summary Judgment

We review summary judgment decisions de novo, engaging in the same inquiry as the trial court. Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is proper if the pleadings, depositions, answers, and admissions, together with the affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). "When ruling on a summary judgment motion, the court is to view all facts and reasonable inferences therefrom most favorably toward the nonmoving party." Lybbert v. Grant County, State of Wash.,

---

[4] We decline to address BIAW's constitutional claims.

7

141 Wn.2d 29, 34, 1 P.3d 1124 (2000) (citing <u>Weyerhaeuser Co. v. Aetna Cas. & Sur. Co.</u>, 123 Wn.2d 891, 897, 874 P.2d 142 (1994)).

Under RCW 42.17A.005(37), "political committee" includes any organization that has "the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." This definition contains two alternative prongs under which an entity is considered a political committee: (1) the contribution prong and (2) the expenditure prong. <u>EFF</u>, 111 Wn. App. at 599.

### Contribution prong

Under the contribution prong, an organization is considered a political committee if it expects to receive or receives contributions toward electoral goals. <u>EFF</u>, 111 Wn. App. at 599. Utter and Ireland contend contemporaneous documents show that BIAW solicited and received pledges, in the form of MAF funds, from the local associations. For example, the "Rossi-lution" signed by heads of the local associations refers to "BIAW" throughout. Documents from the local associations refer to "BIAW" in discussing the local associations' participation in the MAF fundraising effort and their decisions to pledge funds. Other documents show that throughout the fundraising effort, senior officers represented themselves as "BIAW senior officers" and BIAW president Daimon Doyle signed correspondence seeking pledges as "BIAW President." Utter and Ireland contend that BIAW was required to register within two weeks of having

8

the expectation of receiving the pledges for MAF funds from the local associations and was required to report the pledges when received.

BIAW does not dispute that pledges are treated as contributions under the FCPA; rather, it disputes that it was the entity that expected to receive the contributions at issue. It contends that BIAW-MSC received the withheld MAF funds from the local associations and BIAW-MSC donated to ChangePAC. It points out that the MAF funds are generated from a BIAW-MSC program and are revenue to BIAW-MSC, not BIAW. As for the use of "BIAW" in the contemporaneous documents, BIAW contends that while BIAW and BIAW-MSC are legally separate entities with different functions, both are referred to internally as "BIAW." It explains that when its board of directors or any officers direct actions by "BIAW," BIAW and/or BIAW-MSC staff ensures that the appropriate entity — whether BIAW or BIAW-MSC — actually carries them out to comply with regulatory and tax obligations.

We conclude the evidence does not create a genuine issue of material fact as to the contribution prong. The issue is whether BIAW or BIAW-MSC expected to receive and ultimately did receive the MAF funds from the local associations. The evidence shows that BIAW-MSC administered the retro program from which the funds were generated and was formed in part to run the program; BIAW-MSC actually received the fees from the local associations and then contributed them to ChangePAC; and these transactions were made through BIAW-MSC's accounts. BIAW submitted evidence that "BIAW" was used

genLrically to refer to BIAW-MSC, BIAW, or both. The documents to which Utter and Ireland point fail to create an issue of fact.

<u>Expenditure prong</u>

Under the expenditure prong, an organization is considered a political committee by expecting to make or making expenditures to further electoral political goals. <u>EFF</u>, 111 Wn. App. at 599. An additional requirement under this prong is that an organization must have as its primary purpose, or one of its primary purposes, to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions. <u>State v. (1972) Dan J. Evans Campaign Comm.</u>, 86 Wn.2d 503, 509, 546 P.2d 75 (1976).

Utter and Ireland contend the evidence shows that BIAW made or expected to make electoral expenditures. Alternatively, even if those expenditures are attributed to BIAW-MSC, Utter and Ireland argue, BIAW "financed" or "controlled" BIAW-MSC's expenditures and BIAW-MSC's expenditures should therefore be considered made by BIAW under RCW 42.17A.455(2). Finally, they contend electoral activity was one of BIAW's primary purposes during the 2008 election cycle. We consider these issues in turn.

a. <u>Whether BIAW made electoral expenditures</u>

First, Utter and Ireland contend the following evidence shows that BIAW made $233,648.89 in independent expenditures and over $6.4 million in electoral expenditures to other political committees during the 2008 election cycle:

- PDC "Cash Receipts Monetary Contributions" report dated October 13, 2008 stating that "Building Industry Association o" [sic] made an aggregate total contribution of $6,169,175 to ChangePAC.
- PDC reporting form for "Electioneering Communications" dated October 14, 2008 stating that "Building Industry Assn of WA" made "total C-6 expenses" of $233,648.99 in relation to Rossi.
- BIAW reported making in-kind contributions of staff time to ChangePAC and It's Time for a Change.

BIAW responds that the expenditures reflected in these PDC documents are BIAW-MSC expenditures. It contends there was not enough room on the forms for the full name "Building Industry Association of Washington Member Services Corporation" and that the PDC discouraged the use of acronyms. BIAW contends the PDC recognized this issue in its investigation when it wrote, regarding BIAW-MSC's expenditures from 2006 to 2008:

> BIAW-MSC pays for staff members who provide support for reportable independent expenditures, electioneering communications, and contributions to political committees. In these instances, PDC reports show BIAW as the entity providing the support. PDC reports should identify BIAW-MSC as providing the support.

BIAW points to its income statements and BIAW-MSC's income statements to show that BIAW-MSC made the expenditures. It also points to the statement by its executive vice president, Tom McCabe, in a declaration that "BIAW does not contribute to any political candidates or political action committees. Nor does it make political expenditures." It notes that, as a non-profit entity, it must report to the IRS both revenue and expenses on its Form 990, and contends there are no electoral expenditures noted on the 2008 form.

11

We agree with BIAW that the evidence fails to create an issue of material fact that BIAW-MSC made the expenditures shown in the PDC reports. This issue involves the identity of the entity — BIAW or BIAW-MSC—that made the expenditures in question. Along with the other evidence to which BIAW points, the contents of its 2008 Form 990 are inconsistent with BIAW having been the entity that made the expenditures reflected in PDC reports.

However, we conclude that BIAW's 2008 Form 990 itself creates an issue of fact that BIAW made electoral expenditures.[5] Part IV, Line 3 of the form asks,

---

[5] BIAW submits to this court an amended and corrected Form 990, contending that it shows that BIAW did not spend any funds on electoral activities. The amended Form 990 shows that BIAW's answer to Part IV, Line 3 (asking, "Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?") was "no." Exhibit A to Declaration of Art Castle. In a Supplemental Information to Form 990 submitted to the IRS, BIAW explained,

> The organization is amending the 2008 Form 990 to correctly answer Form 990, Part IV, Line 3. The organization only incurs lobbying expenditures, no political expenditures or activities, and, therefore, should have answered this question 'no'. As a result, Schedule C, Part I-A is no longer completed. Schedule C, Part III-B remains the same to properly disclose lobbying expenditures and nondeductible dues information.

BIAW requests this court to consider and rely upon the corrected Form 990, citing RAP 9.11, which provides:

> 'The appellate court may direct that additional evidence on the merits of the case be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.'

RAP 9.11. Ordinarily, under the rule, the appellate court will "direct the trial court to take additional evidence and find the facts based on that evidence." Id.

We decline to direct additional evidence to be taken under RAP 9.11. BIAW does not explain why the requirements of the rule are met here. If this matter were remanded, the trial court could consider the evidence at its own discretion.

"Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part 1." BIAW answered "Yes" and attached Schedule C. On form Schedule C, which contains the heading "Political Campaign and Lobbying Activities," next to the entry for "Political expenditures," BIAW responded, "$165,214." While political expenditures do not necessarily equate to electoral expenditures, BIAW, as the moving party, fails to show that none of the $165,214 noted on Form 990 was spent on electoral activity.

### b. Whether BIAW "controlled" BIAW-MSC's expenditures

Utter and Ireland also contend that even if there is no evidence that BIAW made electoral expenditures, the evidence creates an issue of material fact that BIAW "controlled" BIAW-MSC's expenditures as defined in RCW 42.17A.455(2).[6] They contend that if BIAW controlled BIAW-MSC's expenditures, BIAW-MSC's expenditures are considered made by BIAW.

The preliminary issue we must decide is whether RCW 42.17A.455(2) applies in this context, so that any electoral expenditures made by BIAW-MSC are considered made by BIAW — for the purpose of determining whether BIAW is a political committee — if BIAW "financed, maintained, or controlled" BIAW-MSC's contribution or expenditure activity. RCW 42.17A.455 provides:

---

[6] In addition, Utter and Ireland contend that RCW 42.17A.460 makes BIAW responsible even if it carried out the contribution through BIAW-MSC. We decline to consider this argument because Utter and Ireland make only a passing reference to the statute and do not explain why the evidence showed the statute applies.

13

For purposes of this chapter:

(1) A contribution by a political committee with funds that have all been contributed by one person who exercises exclusive control over the distribution of the funds of the political committee is a contribution by the controlling person.

(2) Two or more entities are treated as a single entity if one of the two or more entities is a subsidiary, branch, or department of a corporation that is participating in an election campaign or making contributions, or a local unit or branch of a trade association, labor union, or collective bargaining association that is participating in an election campaign or making contributions. All contributions made by a person or political committee whose contribution or expenditure activity is financed, maintained, or controlled by a trade association, labor union, collective bargaining organization, or the local unit of a trade association, labor union, or collective bargaining organization are considered made by the trade association, labor union, collective bargaining organization, or local unit of a trade association, labor union, or collective bargaining organization.

(3) The commission shall adopt rules to carry out this section and is not subject to the time restrictions of RCW 42.17A.110(1).

RCW 42.17A.455 (emphases added).

Utter and Ireland argue that under the plain language "[f]or purposes of this chapter," RCW 42.17A.455 applies to all other provisions of chapter 42.17A RCW, including RCW 42.17A.005(37), which defines "political committee." BIAW contends that under RCW 42.17A.455, campaign contributions from a corporation and its controlled entities are aggregated only in determining whether a campaign contribution cap has been reached, not in determining whether an entity is a political committee under RCW 42.17A.005(37). It cites Edelman v. State ex rel. Pub. Disclosure Comm'n, 152 Wn.2d 584, 590, 99 P.3d 386 (2004) in support, pointing to the court's statement that "[RCW 42.17A.455] specifies a

14

relationship between entities in which those entities are considered a single entity for purposes of campaign contribution limits."

When interpreting a statute, we first look to its plain language. State v. Gonzalez, 168 Wn.2d 256, 271, 226 P.3d 13, cert. denied, 131 S. Ct. 318, 178 L. Ed.2d 207(2010) (citing State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007)). If the plain language is subject to one interpretation only, our inquiry ends. Id. However, even the language "for purposes of this chapter" may not be determinative, as illustrated by a case cited by BIAW, Am. Legion Post #149 v. Wash. State Dep't of Health, 164 Wn.2d 570, 192 P.3d 306 (2008).

In 1985, the state legislature had adopted the clear indoor air act, which limited smoking in some public places. Am. Legion Post # 149, 164 Wn.2d at 581 (citing LAWS OF 1985, ch. 236). The act exempted "private facilities" and "private enclosed workplace[s], within a public place, from the smoking ban. Id. (citing former RCW 70.160.020(2) (1985), amended by LAWS OF 2006, ch. 2 § 2; RCW 70.160.060). In 2006, Washington voters enacted Initiative Measure 901, which expanded the prohibition on smoking in public places by amending the definition of a "public place'" to include facilities such as schools, bars, bowling alleys, and casinos. Id. at 581-82 (citing LAWS of 2006, ch. 2). Initiative 901 also prohibited smoking in "'any place of employment.'" Id. at 582 (citing RCW 70.160.030, .020(3)). Chapter 70.160 RCW is now entitled the smoking in public places act. (the Act). Id. at 581-82.

15

American Legion Post #149, a private, nonprofit fraternal organization, owned and operated a private facility open to members and guests. The organization employed several workers to run the facility. Id. at 582-83. At issue was whether the Act prohibited smoking in the Post's facility. Id. at 581. The Act prohibits smoking "in a public place or in any place of employment." RCW 70.160.030. "'Public place'" is defined as "that portion of any building or vehicle used by and open to the public, regardless of whether the building or vehicle is owned in whole or in part by private persons or entities, the state of Washington, or other public entity." RCW 70.160.020(2). The final sentence of the definition of a "'[p]ublic place'" provides, "This chapter is not intended to restrict smoking in private facilities which are occasionally open to the public except upon the occasions when the facility is open to the public." RCW 70.160.020(2). A "'[p]lace of employment'" is defined as "any area under the control of a public or private employer which employees are required to pass through during the course of employment . . . ." RCW 70.160.020(3).

The Post argued that smoking was not prohibited in its facility, pointing to RCW 70.160.020(2). Am. Legion Post #149, 164 Wn.2d at 587. It contended that "chapter" referred to the entire Act, chapter 70.160 RCW, and that if voters had wanted the exception to apply only to the definition of a "public place," the initiative should have modified that sentence. Id. at 587-88.

The court first explained,

'[I]n determining the meaning of a statute enacted through the initiative process, the court's purpose is to ascertain the collective

16

intent of the voters who, acting in their legislative capacity, enacted the measure. . . .' Where the language of an initiative enactment is 'plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation. . . .' In construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it.

Am. Legion Post #149, 164 Wn.2d at 585 (internal quotation marks and citations omitted). Furthermore, the court noted,

An initiative must be read in light of its various provisions, rather than in a piecemeal approach, and in relation to the surrounding statutory scheme. A court must, when possible, give effect to every word, clause and sentence of a statute. The goal is to avoid interpreting statutes to create conflicts between different provisions so that we achieve a harmonious statutory scheme. If there is an apparent conflict between two provisions, the more specific and more recently enacted statute is preferred. Only if the language is ambiguous may the court examine extrinsic sources such as a voter's pamphlet.

Id. at 585-86 (internal quotation marks and citations omitted).

The court held that the Post's interpretation of RCW 70.160.020(2) was inconsistent with the surrounding statutory scheme, voters' intent in enacting Initiative 901 to protect employees from smoking regardless of whether they worked in a public place, and relevant principles of statutory construction. Id. at 588. The exception for private facilities was part of the definition of a "public place" and was not repeated under the definition of a "place of employment." Id. The court concluded that "the exception for private facilities is an exception to the definition of a 'public place' and does not apply to the prohibition against smoking in 'any place of employment.'" Id. at 591. Thus, the language "this chapter" did not refer to the entire act, chapter 70.160 RCW.

17

Am. Legion Post #149 supports the proposition that the language "for purposes of this chapter" does not necessarily mean a provision will apply to every other provision in the chapter at issue. It also leads us to conclude we may look at the context and purpose of a statute and the surrounding statutory scheme. Here, as BIAW and amici[7] note, RCW 42.17A.005 and RCW 42.17A.455 were enacted through different initiatives. Washington's campaign finance reporting and disclosure rules, including the definition of "political committee" contained in RCW 42.17A.005(37), were enacted by voters in 1972 with the passage of Initiative Measure No. 276. Twenty years later, RCW 42.17A.455 was adopted when voters approved Initiative 134, *State of Washington Voters Pamphlet, General Election* 8, 11 (Nov. 3, 1992) to the legislature.

We conclude that voters' intent in enacting the relevant portion of I-134 (codified as RCW 42.17A.455) was to attribute contributions for the purpose of determining whether campaign contribution limits had been reached. I-134 focused on capping campaign contributions, as reflected by its short title and ballot title:

> Official Ballot Title: Shall campaign contributions be limited; public funding of state and local campaigns be prohibited; and campaign related activities be restricted.

---

[7] Washington State Labor Council, SEIU Healthcare 775NW, UFCW 21, Washington State Education Association, SEIU Healthcare 1199NW, and SEIU Local 925. Amici each finance, maintain, or control a political action committee that makes candidate contributions, contributions to political committees, and/or independent expenditures in support of, or in opposition to, various candidates and ballot propositions. Amici Brief 1. None of the amici are registered as a political committee.

Short Title: AN ACT Relating to the regulation of political contributions and campaign expenditures . . . .

Initiative Measure No. 134 (I-134) contained the following codified statement of intent:

By limiting campaign contributions, the people intend to:

(a) Ensure that individuals and interest groups have fair and equal opportunity to influence elective and governmental processes;
(b) Reduce the influence of large organizational contributors; and
(c) Restore public trust in governmental institutions and the electoral process.

RCW 42.17A.400(2). The Washington Supreme Court observed that this legislation "sought to accomplish the initiative's purpose by establishing campaign contribution limits." Edelman, 152 Wn.2d at 587. There is no indication in the language of the initiative informing voters that Part III, Section 6 (codified as RCW 42.17A.455) would expand the obligations of entities required to register and report as political committees.

The text and structure of the initiative also support the proposition that the language following "for purposes of this chapter" in RCW 42.17A.455 is aimed at determining whether campaign contribution limits have been reached. What was codified as RCW 42.17A.455 was Section 6 of Part III (entitled "Contributions") of I-134. The first section of Part III—Section 4—limits the amount that can be contributed to candidates. Section 5 addresses attribution of contributions by family members, Section 6 addresses attribution of contributions by controlled entities, and Section 7 provides that "earmarked" contributions made through a third party are attributed to the original contributor. None of these sections states

19

that it is directed solely to determining whether contribution limits in Section 4 have been met, although that is the evident purpose of the sections in Part III.

Finally, limiting RCW 42.17A.455 to the campaign contribution context is consistent with the definition of political committee itself. Under the plain language of the definition of "political committee" in RCW 42.17A.005(37), the organization must itself make expenditures to be considered a political committee. See RCW 42.17A.005(37). ("'Political committee' means any person (except a candidate or an individual dealing with his or her own funds or property) having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition."). But if RCW 42.17A.455 is applied in the context of defining a political committee, a trade association, labor union, collective bargaining organization (or the local unit of any such entity) can be a political committee even if it does not itself make any political expenditures, so long as it finances, maintains, or controls the contribution or expenditure activity of a political committee. We conclude that RCW 42.17A.455 does not apply so that BIAW-MSC's electoral expenditures are attributed to BIAW, for the purpose of determining whether BIAW is a political committee, if BIAW financed, maintained, or controlled BIAW-MSC's contribution or expenditure activity.

c.  Whether electoral activities were one of BIAW's primary purposes

Finally, we must determine whether there was a genuine issue of material fact that electoral activities were one of BIAW's primary purposes. The following

non-exclusive factors are considered: (1) the organization's stated goals and mission; (2) whether the organization's conduct furthers its stated goals and missions; (3) whether the stated goals and mission would be substantially achieved by a favorable outcome in the election; and (4) whether the organization uses non-electoral means to achieve its stated goals. EFF, 111 Wn. App. at 600. "[I]f the organization has merely restated its primary political purpose in broad nonpolitical terms, the organization's purpose will likely be achieved in an upcoming election. But if electoral political activity is merely one means the organization uses to achieve its legitimate broad nonpolitical goals, electoral political activity cannot be said to be one of the organization's primary purposes." EFF, 111 Wn. App. at 600.

We conclude that while BIAW's mission statement[8] does not support a finding that electoral activity is one of BIAW's primary purposes as a general matter, the evidence in the record, viewed in the light most favorable to Utter and Ireland, nonetheless creates an issue of fact as to whether BIAW's conduct during the 2008 election cycle furthered its stated goals and missions, whether

---

[8] BIAW's mission statement reads:

The Building Industry Association of Washington is the voice of the housing industry in the state of Washington. The association is dedicated to ensuring and enhancing the vitality of the building industry for the benefit of its members and the housing needs of its citizens.

To accomplish this purpose, the association's primary focus is to educate, influence and affect the legislative, regulatory, judicial and executive agencies of Washington's government. The Building Industry Association of Washington will offer its membership those services which can best be provided on a state wide basis and will disseminate information concerning the building industry to all associated members and the public.

BIAW's stated goals and mission would be substantially achieved by Rossi winning the election, and whether BIAW used non-electoral means to achieve its stated goals during that time. There is evidence from which it may be inferred that supporting Rossi's campaign was a top priority for BIAW leading up to the 2008 election and that BIAW made significant efforts toward that end. This evidence includes the following:

- June 29, 2007 meeting minutes for BIAW's Board of Directors show that BIAW president Daimon Doyle announced that he was encouraged by the support from the local associations to contribute to BIAW's 2008 governor fund and that so far over $550,000 had been raised. Rossi was a guest speaker at this meeting and thanked BIAW members for their support.
- In a letter to BIAW members asking them to contribute at least 10 percent of their refunds from the retro program to the 2008 gubernatorial race, Doyle wrote:
  > The next Governor will, in my opinion, make the most significant impact on the long-term success of our industry and our businesses. He or she will be the driving force for a change in our state's business climate—either for better or worse in 2008 and beyond. He or she will appoint the Directors of the Departments of Ecology and Labor & Industries—both agencies that have direct (and potentially very negative) impacts on our industry and our individual businesses. He or she will set the tone in all areas of a government that is pervasive in our lives. No single individual in this state has a greater influence on our future than the Governor. Getting the right person in office is critical.
  > . . .
  > If every member were to contribute just 10% of their refund, we would begin the 2008 Governor's race with a war chest in excess of $3.7 million! Combined with substantial funds that have already been committed by BIAW and its local associations, I believe that we can make a tremendous impact on an election that was so close it took two re-counts to complete last time.
- In a March 9, 2007 email to other BIAW leaders, Doyle wrote, "In light of recent attacks on our entire industry by the legislature, we

22

have never been more in need of a pro-housing Governor than now
. . . ."

- In a March 22, 2007 email, Doyle wrote:
  Our State government has become very anti-business and in many respects anti-builder. This year is just one example of how our industry can be majorly affected by the legislation passed in Olympia. Add to that, our opponents—those who want tighter environmental restrictions and have pledged to dismantle the Retro program—are huge supporters of the current incumbents. With one vote shy of a 2/3 majority in both the House and Senate, it would take huge sums of money and many years of effort to win back even one of those two bodies. However, the change of just one individual, the Governor, would have a profound effect on this state. Regardless of what the legislature votes out, the Governor has the veto pen. . . . We must get a pro-housing Governor in office and 2008 will be our best opportunity.

- In January 2008, newly elected BIAW president Brad Spears announced, "One of my priority goals as the 2008 President of the Building Industry Association of Washington is to replace anti-small business and anti-affordable housing Governor Gregoire with her pro-small business and affordable housing challenger Dino Rossi."

- February 27, 2008 meeting minutes for BIAW's Board of Directors show that Spears announced that BIAW's number one priority this campaign season would be to help Rossi get elected. Spears reported that the General Membership luncheon, which was well attended, featured Rossi as the guest speaker and that Rossi had delivered a "great speech." Id. Four recent polls showed that if the election were held today, Rossi would win. Spears had met with leaders across the state and nation who shared their respect for BIAW due to its successes and efforts. Spears also reported that candidates came to BIAW because they knew BIAW had the resources, will, and tools in place to get the job done. Id.

- In promoting the main benefits of BIAW membership, BIAW cited its "Political Program": "BIAW's experienced team of lobbyists and members . . . work to elect 'business friendly' candidates . . . ."

We conclude that the evidence created a genuine issue of material fact that BIAW made electoral expenditures and that electoral activities were one of its primary purposes during the 2008 election.

23

Preclusive Effect of Attorney General's Actions

BIAW contends that Utter and Ireland's lawsuit was precluded under RCW 42.17A.765(4).[9] Though not for the reasons asserted by BIAW, we agree and affirm the trial court's dismissal of Utter and Ireland's claims on summary judgment.

RCW 42.17A.765(4) provides:

(4) A person who has notified the attorney general and the prosecuting attorney in the county in which the violation occurred in writing that there is reason to believe that some provision of this chapter is being or has been violated may himself or herself bring in the name of the state any of the actions (hereinafter referred to as a citizen's action) authorized under this chapter.
(a) This citizen action may be brought only if:
(i) The attorney general and the prosecuting attorney have failed to commence an action hereunder within forty-five days after the notice;
(ii) The person has thereafter further notified the attorney general and prosecuting attorney that the person will commence a citizen's action within ten days upon their failure to do so;
(iii) The attorney general and the prosecuting attorney have in fact failed to bring such action within ten days of receipt of said second notice; and
(iv) The citizen's action is filed within two years after the date when the alleged violation occurred.

RCW 42.17A.765(4). Thus, a citizen's action may be brought in the name of the State if the State has failed to commence an action. See also Vance v. Offices of Thurston County Comm'rs, 117 Wn. App. 660, 670, 71 P.3d 680 (2003) (a plaintiff can bring a citizen's action under former RCW 42.17.400 only if "authorities fail to act after receiving notice of possible violations."); Crisman v.

---

[9] The trial court did not reach this argument in BIAW's motion for summary judgment.

<u>Pierce County Fire Protection Dist. No. 21</u>, 115 Wn. App. 16, 22, 60 P.3d 652 (2002) (citizen enforcement action may be brought "only after notice to and failure by the attorney general and the prosecuting attorney to act."). A "citizen's action" refers to "any of the actions . . . authorized under this chapter." RCW 42.17A.765(4). The statute permits the following actions:

(1) The attorney general and the prosecuting authorities of political subdivisions of this state may bring civil actions in the name of the state for any appropriate civil remedy, including but not limited to the special remedies provided in RCW 42.17A.750.

(2) The attorney general and the prosecuting authorities of political subdivisions of this state may investigate or cause to be investigated the activities of any person who there is reason to believe is or has been acting in violation of this chapter, and may require any such person or any other person reasonably believed to have information concerning the activities of such person to appear at a time and place designated in the county in which such person resides or is found, to give such information under oath and to produce all accounts, bills, receipts, books, paper and documents which may be relevant or material to any investigation authorized under this chapter.

(3) When the attorney general or the prosecuting authority of any political subdivision of this state requires the attendance of any person to obtain such information or produce the accounts, bills, receipts, books, papers, and documents that may be relevant or material to any investigation authorized under this chapter, he or she shall issue an order setting forth the time when and the place where attendance is required and shall cause the same to be delivered to or sent by registered mail to the person at least fourteen days before the date fixed for attendance. The order shall have the same force and effect as a subpoena, shall be effective statewide, and, upon application of the attorney general or the prosecuting authority, obedience to the order may be enforced by any superior court judge in the county where the person receiving it resides or is found, in the same manner as though the order were a subpoena. The court, after hearing, for good cause, and upon application of any person aggrieved by the order, shall have the right to alter, amend, revise, suspend, or postpone all or any part of

its provisions. In any case where the order is not enforced by the court according to its terms, the reasons for the court's actions shall be clearly stated in writing, and the action shall be subject to review by the appellate courts by certiorari or other appropriate proceeding.

RCW 42.17A.765 (1-3).

The issue before us is what constitutes "action" by the State. Utter and Ireland contend that because the AG's lawsuit named only BIAW-MSC, not BIAW, Utter and Ireland were free to file a lawsuit against BIAW. BIAW contends that under the statute's plain language, so long as the State files a lawsuit (which it did here, against BIAW-MSC) based on any allegations in a citizen's notice letter, the citizen may not bring an action.

There are few cases addressing when a citizen's action under RCW 42.17A.765 may be brought. In one such case, EFF, the Evergreen Freedom Foundation filed an administrative complaint against the Washington Education Association (WEA) with the AG, alleging various violations of the Public Disclosure Act, former chapter 42.17 RCW, in WEA's efforts opposing two statewide initiatives in the 1996 general election. Id. at 592, 594. We noted that EFF was "free to file a citizen's lawsuit on the issues that either the [PDC] or the AG did not act on." Id. at 594. We concluded that where the PDC acted on certain allegations against WEA by filing an administrative action based on those allegations, those specific allegations could not be included in EFF's citizen's action. What we did not have occasion to decide in EFF is whether the AG or the PDC "fail[s] to commence an action" under RCW 42.17A.765(4) when it takes

26

action under RCW 42.17A.765(2) or (3) but declines to bring a civil action under subsection (1).

Where a "citizen's action" refers to any of the actions authorized under chapter 42.17A RCW, we think it logical that an "action" by the AG or the PDC also refers to any of the actions authorized under RCW 42.17A.765. Thus, we conclude that if the State takes an action under RCW 42.17A.765—such as completing an investigation and obtaining information under subsection (2)—within the 45-day period under subsection (4)(a)(i) or the ten-day period under subsection (4)(a)(iii), a citizen's action may not be brought. To hold otherwise would mean that even where the State has thoroughly investigated an allegation and determined it to be without merit, a citizen action could still be filed in the State's name. In other words, as we observed in EFF, "every watchdog group would be able to demand that the PDC find the watchdog's allegations meritorious or the watchdog could sue in superior court." Id. at 609.

Here, on July 25, 2008, Utter and Ireland sent a 45-day notice letter to the State in which they alleged that BIAW and BIAW-MSC qualified as political committees under both the contribution and expenditure prongs. The same day, the AG forwarded the letter to the PDC for it to investigate Utter and Ireland's allegations. Utter and Ireland sent a ten-day notice letter on September 9, 2008. By September 11, the PDC had completed an investigation and issued a "Report of Investigation" regarding its findings and conclusions. On September 19, the

27

AG filed suit against BIAW-MSC. Utter and Ireland filed their lawsuit against BIAW on October 6.

As to the allegations against BIAW under the contribution prong, the PDC determined that the contributions in question had actually been received by BIAW-MSC. See CP at 66. The PDC concluded that the evidence supported the allegation that BIAW-MSC committed "multiple apparent violations of RCW 42.17 by failing to register as a political committee and report the contributions it solicited, received and retained from its local associations in 2007, and by failing to report expenditures to ChangePAC in 2008 with the contributions received." CP at 59. Regarding the allegations against BIAW under the expenditure prong, the PDC noted that it had reviewed BIAW's revenues and expenditures for 2006, 2007, and the first six months of 2008. The PDC concluded that BIAW "does not solicit or receive contributions to support or oppose candidates or ballot propositions, and does not contribute to candidates or political committees."[10] CP at 69. Based on the results of PDC's investigation and report, the AG filed a lawsuit against BIAW-MSC in Thurston County but decided not to file a lawsuit against BIAW.

The State took an action against BIAW under RCW 42.17A.765 when it caused the PDC to investigate the allegations that BIAW was a political

---

[10] We recognize that the PDC's conclusion that BIAW did not make any expenditures to further electoral political goals appears to conflict with our determination that the evidence (BIAW's tax Form 990) creates an issue of fact as to whether BIAW was a political committee under the expenditure prong. We note, however, that it is still unclear whether any of the "political expenditures" in BIAW's Form 990 constituted electoral expenditures; as we noted, BIAW simply has not provided the evidence to clarify what this money was spent on. The PDC may have determined that none of the political expenditures constituted electoral expenditures, or it may not have relied on the Form 990 that is in the record before this court.

28

committee and then declined to file a lawsuit based on the PDC's conclusion that BIAW did not receive contributions or make expenditures to further electoral political goals and was not a political committee. While a citizen's action should be permitted where the State refuses to investigate or determine the merit of a citizen's complaint, to permit a citizen to bring a lawsuit where the State has investigated the allegations or caused them to be investigated, determined them to lack merit, and decided it will not bring an action is inconsistent with the notion that the citizen's action is brought "in the name of the state."

Cross-Appeal of Attorney's Fees

BIAW sought attorney's fees from Utter and BIAW for bringing a citizen's action "without reasonable cause" under RCW 42.17A.765(4)(b). It also sought an award of fees against the State, claiming fees were due under RCW 42.17A.765(5) for the State's failure to intervene in the action.

A trial court's denial of a motion for attorney's fees is reviewed for abuse of discretion. Highland School Dist. No. 203 v. Racy, 149 Wn. App. 307, 312, 202 P.3d 1024 (2009). "Discretion is abused when it is exercised on untenable grounds or for untenable reasons." Id. (citing State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

First, BIAW sought fees from Utter and Ireland under RCW 42.17A.765(4)(b), which provides:

> If the person who brings the citizen's action prevails, the judgment awarded shall escheat to the state, but he or she shall be entitled to be reimbursed by the state of Washington for costs and attorneys' fees he or she has incurred. In the case of a citizen's action that is

29

dismissed and that the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorneys' fees incurred by the defendant.

The purpose of this provision is "to prevent frivolous and harassing lawsuits." EFF, 111 Wn. App. at 615 (internal citation omitted). "Frivolous" lawsuits and actions "without reasonable cause" have been defined as those that "cannot be supported by any rational argument on the law or facts." Bill of Rights Legal Foundation v. Evergreen State College, 44 Wn. App. 690, 696-97, 723 P.2d 483 (1986) (applying RCW 4.84.185, providing for attorney's fees in actions that are "frivolous and advanced without reasonable cause"). "[A]llegations that, upon careful examination, prove legally insufficient to require a trial are not, for that reason alone, frivolous." Id. (quoting Hughes v. Rowe, 449 U.S. 5, 101 S. Ct. 173, 178, 66 L. Ed. 2d 163 (1980)).

We conclude the trial court did not abuse its discretion in denying BIAW's fee request. BIAW cites the following evidence that Utter and Ireland's lawsuit was brought without reasonable cause: (1) their claims were precluded by the AG's action against MSC; (2) the evidence indicated that the actions at issue were those of MSC; (3) the PDC and AG determined their claims lacked merit and declined to pursue claims against BIAW; (4) the urgency of the suit was manufactured to disrupt the campaign of and generate negative publicity regarding Rossi; (5) Utter and Ireland were motivated by a desire to punish BIAW for political speech they did not like; and (6) their litigation tactics unreasonably increased the cost of litigation.

These reasons do not demonstrate an abuse of discretion by the trial court. The first involves a disputed legal issue that the trial court did not resolve given the basis of its decision. The second reason continues to be disputed by the parties on appeal. The third does not show that the lawsuit was without a reasonable basis because it is apparent that Utter and Ireland disagree with the conclusions of the PDC and the AG. As for the fourth and fifth reasons, Utter and Ireland's motives and concerns in filing suit, do not factor into whether they had reasonable cause to bring the lawsuit or whether it was frivolous. Nor does the standard take into consideration a plaintiff's litigation tactics.

BIAW also claims the trial court abused its discretion in denying its request for attorney's fees from the State under RCW 42.17A.765(5), which provides:

> In any action brought under this section, the court may award to the state all costs of investigation and trial, including reasonable attorneys' fees to be fixed by the court. If the violation is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, may be trebled as punitive damages. If damages or trebled damages are awarded in such an action brought against a lobbyist, the judgment may be awarded against the lobbyist, and the lobbyist's employer or employers joined as defendants, jointly, severally, or both. If the defendant prevails, he or she shall be awarded all costs of trial, and may be awarded reasonable attorneys' fees to be fixed by the court to be paid by the state of Washington.

An award of fees pursuant to RCW 42.17A.765(5) is discretionary. San Juan County v. No New Gas Tax, 160 Wn.2d 141, 165, 157 P.3d 831 (2007).

BIAW contends fees were due to it because the AG failed to intervene despite concluding that Utter and Ireland's claims were barred. Utter and Ireland

point out the State was never given notice of BIAW's motion for attorneys' fees, let alone given an opportunity to appear and contest such motion.

We agree with Utter and Ireland. The State was not a party to this action, and BIAW cites no authority to support the proposition that the State must pay costs and fees in a case where it does not intervene and the defendant prevails. Furthermore, it is speculative to suggest the trial court would have dismissed this case in the event that the State had intervened.

Furthermore, we deny BIAW's request for attorney fees on appeal under RAP 18.9 and RCW 4.84.185. We do not agree that Utter and Ireland's appeal is frivolous.

Affirmed.

WE CONCUR:

_____, A.C.J.

_____          _____

ORDER GRANTING RESPONDENT'S MOTION FOR RECONSIDERATION, WITHDRAWING OPINION FILED OCTOBER 29, 2012; AND SUBSTITUTING OPINION

On October 29, 2012, this court filed its unpublished opinion in the above-entitled action. Respondent/cross-appellant has moved for reconsideration. The court has taken the matter under consideration and has decided to grant the motion for reconsideration.

32

IT IS HEREBY ORDERED that the respondent/cross-appellant's motion for reconsideration is granted;

IT IS FURTHER ORDERED that the unpublished opinion of this court filed in the above-entitled action on October 29, 2012 be withdrawn and that the attached opinion be substituted in its place.