

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **JAN 2 2 2015**

*Madsen*  C.Q.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Jan. 22, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROBERT F. UTTER and FAITH IRELAND, in the name of the STATE OF WASHINGTON, | NO. 89462-1 |
| Petitioners, | EN BANC |
| v. | |
| BUILDING INDUSTRY ASSOCIATION OF WASHINGTON, | Filed    **JAN 2 2 2015** |
| Respondent. | |

GORDON McCLOUD, J.—Retired Justices Robert Utter and Faith Ireland (plaintiffs) sued the Building Industry Association of Washington (BIAW), alleging that BIAW violated Washington's Fair Campaign Practices Act (FCPA), chapter 42.17A RCW, in part by failing to register as a political committee during the 2007-2008 campaign season. The trial court granted BIAW's motion for summary judgment and dismissed the case on the ground that there was no material factual dispute and BIAW was entitled to judgment as a matter of law, but it denied BIAW's

request for attorney fees. The Court of Appeals, following reconsideration, ultimately affirmed; it stated in dicta that there was an issue of fact as to whether BIAW met the statutory definition of a "political committee," but held only that the plaintiffs' case did not meet the procedural prerequisites to filing a citizen suit. *Utter v. Bldg. Indus. Ass'n of Wash.*, 176 Wn. App. 646, 672-73, 310 P.3d 829 (2013). The Court of Appeals also affirmed the trial court's denial of BIAW's request for attorney fees. *Id.* at 674-77.

The plaintiffs petitioned this court, and we accepted review. *Utter v. Bldg. Indus. Ass'n of Wash.*, 179 Wn.2d 1021, 336 P.3d 1165 (2014). The BIAW cross petitioned on the attorney fees claim, but we denied review. *Id.* We reverse the Court of Appeals and hold that (1) the plaintiffs' suit was not procedurally barred under our State's citizen suit provision and (2) the plaintiffs have presented sufficient evidence to raise a genuine issue of material fact about whether BIAW met the statutory definition of a "political committee."

## FACTS

The nonprofit BIAW formed the for-profit BIAW Member Services Corporation (BIAW-MSC) in 1993. BIAW and BIAW-MSC share the same leadership—BIAW's president, vice president, first vice president, secretary, treasurer, and immediate vice president are also the officers of BIAW-MSC. BIAW

and BIAW-MSC also share the same staff; they are paid by one organization or the other depending on the nature of their work.

BIAW established BIAW-MSC largely to administer a "retro program" under rules established by the Department of Labor and Industries (L&I). Clerk's Papers (CP) at 175. Under the retro program rules, members can pool their workers compensation risks and, at the end of the reporting period, obtain a refund if the actual claims add up to less than the expected claims. *See* RCW 51.18.010. L&I typically pays the refund to BIAW, the organization eligible to receive the refund, and then BIAW deposits the refund into the bank account of BIAW-MSC. A portion of the refund amount is eventually distributed to BIAW's local associations. BIAW calls its retro program the "Return on Industrial Insurance program" (ROII).

It is undisputed that in 2007, the ROII refund was much greater than anticipated. As a result, in 2007, BIAW, or BIAW-MSC (this *is* disputed), asked the local associations to pledge any refund amount in excess of their budget projections to aid in the upcoming governor's race. Ultimately those funds were transferred to ChangePAC, a political action committee.

On July 25, 2008, the plaintiffs sent a letter to the attorney general (AG) stating that the plaintiffs suspected BIAW and BIAW-MSC had each violated the FCPA by failing to register as a political committee and failing to report contributions and expenditures. The AG referred the complaint to the Public

Disclosure Commission (PDC) that same day for investigation. The PDC investigation concluded that BIAW was not a political committee but that BIAW-MSC may have been. The AG sued BIAW-MSC, but not BIAW. BIAW-MSC settled.

The plaintiffs then sued BIAW under the citizen suit provision of the FCPA, which permits citizens to file a "citizen action" alleging violations of the act if they give notice of a violation in writing to the AG and the AG "fail[s] to commence an action hereunder." RCW 42.17A.765(4)(a)(i). Plaintiffs alleged that BIAW violated the FCPA by failing to register as a political committee, by improperly coordinating expenditures with Mr. Dino Rossi (gubernatorial candidate in 2008), and by exceeding contribution limits. BIAW moved for summary judgment on several grounds. The trial court granted BIAW's motion without explaining its reasoning but denied BIAW's request for attorney fees under RCW 42.17A.765(4)(b).[1] Plaintiffs appealed the grant of summary judgment only as to the political committee claim, and BIAW cross appealed the denial of attorney fees.

The Court of Appeals reversed the trial court's grant of summary judgment in an unpublished opinion but then granted BIAW's motion for reconsideration. 176

---

[1] "In the case of a citizen's action that is dismissed and that the court also finds was brought without reasonable cause, the court may order the person commencing the action to pay all costs of trial and reasonable attorney fees incurred by the defendant." RCW 42.17A.765(4)(b).

Wn. App. 646. On reconsideration, in a published opinion, the Court of Appeals stated in dicta that the plaintiffs had raised an issue of fact sufficient to prevent summary judgment. *Id.* at 656. But the appellate court affirmed the trial court's dismissal of the case on a procedural ground. It explained that the PDC investigation into BIAW constituted an "action" by the AG under the citizen suit provision, thus precluding the plaintiffs from commencing their own "action." *Id.* at 670-74. It also affirmed the trial court's denial of BIAW's request for attorney fees. *Id.* at 674-77.

Plaintiffs petitioned this court for review, and we granted it. 179 Wn.2d 1021. We denied BIAW's cross petition on the attorney fees issue. *Id.* There are thus only two issues before the court. The first question is whether the PDC investigation precludes plaintiffs from suing BIAW under the citizen suit provision. As discussed below, the answer to that question is no. We therefore also address the second question, that is, whether the trial court erred in granting summary judgment to BIAW on the political committee issue. The answer to that question is yes, because some aspects of the political committee issue present triable questions of fact.

## ANALYSIS

### I. STANDARD OF REVIEW

This case requires us to interpret several provisions of the FCPA. We review matters of statutory interpretation de novo. *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d 282 (2003). The provisions of the FCPA, moreover, "shall be liberally

construed to promote complete disclosure of all information respecting the financing of political campaigns and lobbying, and the financial affairs of elected officials and candidates, and full access to public records so as to assure continuing public confidence of fairness of elections and governmental processes, and so as to assure that the public interest will be fully protected." RCW 42.17A.001.

We likewise review a trial court's order granting summary judgment de novo. *Mohr v. Grantham*, 172 Wn.2d 844, 859, 262 P.3d 490 (2011). In conducting this review, we view all the evidence in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Civil Rules (CR) 56(c).

## II. THE CITIZEN SUIT PROVISION

A statute gives Washington citizens the right to sue for unfair campaign practices. But there is a prerequisite. The citizen must first give notice of a violation in writing to the AG; the citizen may then sue if the AG "failed to commence an action hereunder within forty-five days after the notice." RCW 42.17A.765(4)(a)(i). The Court of Appeals held that where the AG refers a complaint to the PDC for investigation after receiving such notice from a citizen, the *referral* itself counts as "'commenc[ing] an action.'" *Utter*, 176 Wn. App. at 672-73 (quoting RCW 42.17A.765 (4)(a)(i)). Thus, according to the Court of Appeals, where the AG refers

for investigation or investigates a complaint, the notice-giving citizen may not sue even if the AG declines to sue. *Id.*

Our review involves statutory interpretation of RCW 42.17A.765. That statute is titled "Enforcement." Its first three subsections define various ways the AG may enforce the fair campaign statutes:

> (1) The attorney general and the prosecuting authorities of political subdivisions of this state *may bring civil actions* in the name of the state for any appropriate civil remedy, including but not limited to the special remedies provided in RCW 42.17A.750.

> (2) The attorney general and the prosecuting authorities of political subdivisions of this state *may investigate or cause to be investigated* the activities of any person who there is reason to believe is or has been acting in violation of this chapter, and *may require* any such person or any other person reasonably believed to have information concerning the activities of *such person to appear at a time and place designated* . . . to give such information under oath and to produce all . . . documents which may be relevant or material to any investigation authorized under this chapter.

> (3) When the attorney general or the prosecuting authority of any political subdivision of this state requires the attendance of any person to obtain such information . . . , he or she *shall issue an order setting forth* the time when and the place where attendance is required and shall cause the same to be delivered to or sent by registered mail to the person at least fourteen days before the date fixed for attendance. The order shall have the same force and effect as a subpoena . . . .

RCW 42.17A.765 (emphasis added). Finally, subsection (4) provides a mechanism for citizen, as opposed to AG, enforcement:

> A person who has notified the attorney general and the prosecuting attorney in the county in which the violation occurred in writing that

there is reason to believe that some provision of this chapter is being or has been violated may himself or herself bring in the name of the state *any of the actions (hereinafter referred to as a citizen's action) authorized under this chapter.*

RCW 42.17A.765(4) (emphasis added). A "person" may "bring" such a "citizen's action," however, only if "[t]he attorney general and the prosecuting attorney have failed to *commence an action hereunder* within forty-five days after the notice." RCW 42.17A.765(4)(a)(i) (emphasis added).

The Court of Appeals reasoned that subsections (2) and (3) above, permitting the AG to instigate an investigation and issue orders to facilitate the investigation, constituted "actions . . . authorized under this chapter." RCW 42.17A.765(4). Thus, the Court of Appeals concluded that if the AG refers a complaint for investigation, then it has not "failed to commence an action hereunder." RCW 42.17A.765(4)(a)(i). In sum, therefore, if the AG merely investigates, the citizen cannot sue. *Utter*, 176 Wn. App. at 672-74.

We must therefore decide what it means for the AG to "commence an action" under RCW 42.17A.765(4)(a)(i). The Court of Appeals equates the word "action" in RCW 42.17A.765(4) with the investigatory enforcement mechanisms laid out in subsections (2) and (3). But only subsection (1) uses the word "actions"—it says, "The attorney general and the prosecuting authorities of political subdivisions of this state may bring civil actions . . . ." RCW 42.17A.765(1). The other subsections

refer to investigatory mechanisms the AG may use to enforce fair campaign laws and make no mention of "actions."[2]

Moreover, the word "action," as used in "failed to commence an action hereunder," RCW 42.17A.765(4)(a)(i), has a context. The introductory paragraph immediately preceding that phrase clearly grants citizens the right to "bring in the name of the state *any of the actions* (hereinafter referred to as a citizen's action) authorized under this chapter." RCW 42.17A.765(4) (emphasis added). This sequencing suggests that "commenc[ing] an action" in subsection (4)(a)(i) refers back to the same type of action as the "citizen['s] action" in subsection (4)(a)—the immediately preceding introductory paragraph using the word "action." This sequencing also suggests that "commenc[ing] an action" in subsection (4)(a)(i) does not include the other nonaction enforcement steps available to the AG per the previous subsections—that is, "investigat[ing]," RCW 42.17A.765(2), "requir[ing]" a person to appear, *id.*, or "issu[ing] an order," RCW 42.17A.765(3).

Further, as a matter of plain language, "an action" and the phrase "commence an action" are legal terms of art that mean "a lawsuit" or "to sue." *See, e.g.,* BLACK'S LAW DICTIONARY 35 (10th ed. 2014). In accordance with that plain meaning, the

---

[2] Subsection (3) does contain the word "actions," but it is used in a context irrelevant to this case: "In any case where the order is not enforced by the court according to its terms, the reasons for the court's actions shall be clearly stated in writing . . . ." RCW 42.17A.765(3).

statute does not use the term "action" in isolation but refers to "bring[ing]," "fil[ing]," and, in the specific provision at issue, "commenc[ing]" an action. RCW 42.17A.765(1), (4), (5). "Commence an action" does not mean "to investigate" in ordinary legal terminology. *See, e.g., Goldmark v. McKenna*, 172 Wn.2d 568, 575, 259 P.3d 1095 (2011) (attorney general has power to commence actions); *Waples v. Yi*, 169 Wn.2d 152, 159, 234 P.3d 187 (2010) (action is "commence[d]" by filing complaint (citing CR 3(a))); *State v. Conte*, 159 Wn.2d 797, 810, 154 P.3d 194 (2007) (discussing attorney general's power to "bring an action"); *Whitney v. Buckner*, 107 Wn.2d 861, 865, 734 P.2d 485 (1987) (right of access to courts includes right to "bring" or "commence" "actions"); *Berge v. Gorton*, 88 Wn.2d 756, 761, 567 P.2d 187 (1977) (attorney general has power to "commence actions"). The Court of Appeals' interpretation is, thus, probably not what the voters intended.[3]

In addition, the Court of Appeals' interpretation causes absurd results. If subsections (2) and (3) are authorized "actions" under chapter 42.17A RCW, then they are also "citizen's actions." RCW 42.17A.765(4) ("A person who has notified the [AG] may himself or herself bring in the name of the state any of the actions (hereinafter referred to as a citizen's action) authorized under this chapter."). Thus,

---

[3] The statute at issue was created through the initiative process. We interpret initiatives according to the general rules of statutory construction. *City of Spokane v. Taxpayers of City of Spokane*, 111 Wn.2d 91, 97, 758 P.2d 480 (1988) (citing *Hi-Starr, Inc. v. Liquor Control Bd.*, 106 Wn.2d 455, 460, 722 P.2d 808 (1986)).

under the Court of Appeals' interpretation, if the AG fails to act, a citizen could investigate on his or her own in the name of the state, personally issue orders with the same authority as a subpoena; require the appearance of other citizens to answer questions, and take all the other steps authorized by subsections (2) and (3) above for the AG. That is not a reasonable interpretation of the statute.

The plaintiffs also argue that as a practical matter, the AG initially refers *all* complaints to the PDC for investigation. Thus, if the Court of Appeals' interpretation were correct, the PDC—a government agency—would unilaterally bar all citizen suits for violation of Title 42 RCW just by investigating. The voters cannot possibly have intended to create a citizen's right to sue when the government will not but allow the government to bar every one of those suits with a procedural quirk.

BIAW argues, however, that there is a difference between a routine referral of a complaint and a case like this one, where the PDC conducts a substantial investigation and makes a recommendation to the AG regarding the merits of a case. BIAW thus asserts that a more formal investigation by the PDC constitutes an "action" under the statute, while a less formal investigation does not. BIAW offers no citation for this distinction, nor does it explain how to tell the difference between them.

We decline BIAW's invitation to have the courts engage in an after-the-fact

11

analysis of whether a particular investigation was thorough enough to qualify as an "action," especially without established standards to help the courts make such a determination. Moreover, BIAW's interpretation would defeat the purpose of providing for citizen suits in the first place, because the AG likely declines to sue in exactly those instances where the PDC investigation concludes that no violation occurred. The statute is obviously based on the notion that the government *may be wrong*, and then it is up to citizens to expose the violation.[4]

Finally, BIAW argues that this court has held that the citizen suit provision was constitutional "because it applied only in those instances where the state took 'no action,' investigatory or otherwise, at the end of the statutory notice periods." BIAW's Suppl. Br. at 10 (emphasis omitted) (quoting *Fritz v. Gorton*, 83 Wn.2d 275, 314, 517 P.2d 911 (1974)). Thus, BIAW argues, interpreting "action" here to

---

[4] BIAW, in a brief responding to amici arguments, also argues that "commence an action" must include "investigation" because otherwise citizens could sue even where the PDC pursues an administrative action based on an investigation of a citizen's complaint, as it is permitted to do under RCW 42.17A.755. BIAW argues it would be an absurd result to permit both a PDC administrative action and a citizen suit. First, the PDC in this case did not commence any action, administrative or judicial; thus, this question is not presented. Second, BIAW does not explain why that result is absurd. Through administrative enforcement, the PDC may issue orders requiring the respondent "to cease and desist from the activity that constitutes a violation" and "may assess a penalty in an amount *not to exceed ten thousand dollars*." RCW 42.17A.755(4) (emphasis added). The amounts at issue in a lawsuit are significantly higher. For example, BIAW-MSC settled the AG's suit against it for $584,000. When a citizen wins a suit under the FCPA, "the judgment awarded shall escheat to the state," less the citizen's costs and attorney fees. RCW 42.17A.765(4)(b). A PDC action thus serves as significantly less of a deterrent to illegal campaign practices.

exclude "investigation" renders the citizen suit provision unconstitutional.

The cited case does not make the holding BIAW attributes to it. Instead, we

said:

> In our view, the qui tam provision of initiative section 40(4) poses no problem of constitutional dimension. We note respondents' assertion that they fear the threat of frivolous and unwarranted harassment suits. In this connection we can also note that should the suitor fail in his action the trial court, upon finding lack of reasonable cause, may reimburse the defendant for his costs and attorney's fees. In view of the current high costs of legal services, we regard this as no small deterrent against frivolous and harassing suits. Additionally, the plaintiff in such cases is required to give the Attorney General a 40-day notice of an alleged violation. The litigant may then proceed only after the service of a second 10-day notice results in no action on the part of the Attorney General.
>
> We feel that these specified safeguards are ample protection against frivolous and abusive lawsuits. Should, however, the courts experience a significant number of palpably frivolous lawsuits, this court may not be without the tools to fashion a remedy within its rule-making powers.

*Fritz*, 83 Wn.2d at 314 (emphasis omitted). Thus, *Fritz* does not support BIAW's

argument on this point.

We hold that RCW 42.17A.765 precludes a citizen suit only where the AG or

local prosecuting authorities bring a suit themselves, and it does not preclude a

citizen suit where the AG declines to sue.[5]

---

[5] We do not address the question of whether administrative action by the PDC against an entity would preclude a citizen suit, as discussed in note 2, *supra*.

III.   THE DEFINITION OF "POLITICAL COMMITTEE"

We next consider whether the trial court erred in granting summary judgment to BIAW. Specifically, we must decide if the plaintiffs have raised a genuine issue of material fact regarding whether BIAW fell within the statutory definition of a "political committee" during the relevant time period. We hold that they have.

*A. Plaintiffs Have Raised a Genuine Issue of Material Fact about Whether BIAW Fell under Washington's Definition of a "Political Committee" During the 2007-2008 Campaign Season*

A "political committee" is required to file a statement of organization with the PDC, RCW 42.17A.205(1), and make a variety of detailed disclosures. *Id.*; *see also* RCW 42.17A.235. The central issue here is whether BIAW (as opposed to BIAW-MSC) was a political committee and therefore violated the law by failing to file and disclose.

RCW 42.17A.005(37) defines "political committee":

> "Political committee" means any person (except a candidate or an individual dealing with his or her own funds or property) *having the expectation of receiving contributions or making expenditures* in support of, or opposition to, any candidate or any ballot proposition.

(Emphasis added.) Thus, under this statute, an entity becomes a "political committee" with reporting requirements if it "expect[s]" to "receiv[e] contributions" or "mak[e] expenditures" regarding an upcoming election. *Id.* The statute does not say what proportion of the entity's purpose, if any, must be devoted to "expect[ed]"

expenditures to qualify as a political committee with reporting requirements. *Id.*

To provide some background for our discussion of this definition and how it applies to this case, we begin by reviewing the few prior Washington decisions interpreting that statutory definition. This court has addressed the definition of "political committee" in only one relevant case, *State v. (1972) Dan J. Evans Campaign Comm.*, 86 Wn.2d 503, 546 P.2d 75 (1976).[6] The relevant portion is only one paragraph, and since that paragraph represents almost all this court's jurisprudence on the issue, we quote it in full:

> In the instant case, the Dan Evans Committee made a single contribution of $500 to the Early Birds Fund of the Washington Republican Central Committee, a political committee obligated to disclose the contribution. The record reflects no expenditures for the purpose of supporting or opposing a specific candidate or ballot proposition. No other contributions of a similar nature were made. There is no competent evidence in the record to indicate that the Dan Evans Committee solicited, received, or even had the expectation of receiving contributions to be used in support of or in opposition to candidates or ballot propositions. To require reporting and disclosure by the Dan Evans Committee or other persons who make a single contribution to a political committee under these circumstances (in the absence of other qualitative facts) would result in an unnecessary and unreasonable duplication and extension of the act's detailed and somewhat lengthy reporting requirements. *Where the surrounding facts and circumstances indicate that the primary or one of the primary purposes of the person making the contribution* is to affect, directly or

---

[6] We have held that the words "in support of, or opposition to, any candidate" in the statutory definition did not render the statute vague, but that holding is not relevant here. *Voters Educ. Comm. v. Wash. State Pub. Disclosure Comm'n*, 161 Wn.2d 470, 490, 166 P.3d 1174 (2007).

15

indirectly, governmental decision making by supporting or opposing candidates or ballot propositions, then that person becomes a 'political committee' and is subject to the act's disclosure requirements. *See* Attorney General Opinion 1973, June 8, 1973. *The primary purpose* of the Dan Evans Committee was *not* to influence the political process by supporting or opposing candidates or ballot propositions through expenditures of its funds, but to pay for miscellaneous expenses incurred by Governor Evans and his staff in connection with his position as a public official. Plaintiff's contention to the contrary creates no material issue of fact.

*Id.* at 508-09 (some emphasis added). This discussion first uses the language "the primary *or one of the primary purposes*" to describe what it takes to trigger reporting requirements based on election expenditures. *Id.* at 509 (some emphasis added). But it actually concludes that the committee in that case lacked *"the primary purpose*[ ]" of influencing an election without going on to address whether it also lacked *a* primary purpose of doing so. *Id.* (some emphasis added). Thus, although this case has been cited for adopting a looser "a primary purpose" test triggering filing and reporting requirements under the "expenditure" prong of RCW 42.17A.005(37), rather than the more restrictive "the primary purpose" test as the prerequisite, the case does not clearly express that as a holding.

The Court of Appeals, however, has so held, in only one case (not counting the instant case). According to the Court of Appeals:

The Act sets forth two alternative prongs under which an individual or organization may become a political committee and subject to the Act's reporting requirements. "'Political committee'"

16

means any person . . . having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17.020(33). Thus, a person or organization may become a political committee by either (1) expecting to receive or receiving contributions, or (2) expecting to make or making expenditures to further electoral political goals.

*State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 111 Wn. App. 586, 598, 49 P.3d 894 (2002) (*EFF*) (alteration in original). The *EFF* court then stated that, according to this court in *Dan J. Evans*, an entity will not become a political committee with filing and disclosure requirements under the "expenditure" prong unless it also has the support of a political candidate or initiative as the "'primary or one of the primary purposes.'" *Id.* at 598-99 (quoting *Dan J. Evans*, 86 Wn.2d at 509).

The parties make statutory and constitutional arguments about how to interpret, and to apply, these "primary purpose" tests. As this summary shows, our prior precedent does not fully answer those questions. Clearly, though, an entity can meet the definition of a "political committee" under either the "receiving contributions" or "making expenditures" portion of the statutory definition, plus whatever "purpose" test might also be added on to that statutory definition. We address whether the plaintiffs' claims survive under either the contribution prong or the expenditure prong of the statute, and we deal with the controversy over the "purpose" test under the expenditure prong—the only prong under which BIAW

raises it.

1. Contribution Prong

The Court of Appeals in this case stated that "the evidence does not create a genuine issue of material fact as to the contribution prong." *Utter*, 176 Wn. App. at 656. It explained, "The issue is whether BIAW or BIAW-MSC expected to receive *and ultimately did receive* the . . . funds [contributions] from the local associations." *Id.* (emphasis added). It then concluded that because BIAW-MSC, not BIAW, ultimately received the contributions in its account and then disbursed them to a registered political committee, ChangePAC, there was no issue of fact as to whether BIAW expected to receive contributions. *Id.*

But the contribution prong, as the Court of Appeals stated correctly earlier in its opinion, asks whether an organization "expects to receive *or* receives contributions toward electoral goals. " *Id.* at 655 (emphasis added) (citing *EFF*, 111 Wn. App. at 599). Not whether it expects to receive *and* receives. That interpretation is in line with the statutory language: "'Political committee' means any person . . . having the expectation of receiving contributions or making expenditures." RCW 42.17A.005(37). "Expectation" clearly applies to "contributions" (and also "expenditures").

The plaintiffs therefore have the better of the argument when they say that the ultimate disposition of the funds does not answer the contribution question; the

expectation is what matters. And here, as plaintiffs explain, they have presented evidence tending to show that BIAW expected contributions.

This is clear from the statutory definition of "contribution" and the plaintiffs' evidence tending to show such "contributions." A "contribution" is defined in part as a "pledge," RCW 42.17A.005(13)(a)(i), and an organization must register as a political committee "within two weeks after organization or within two weeks after the date the committee first has the expectation of receiving contributions or making expenditures in any election campaign, whichever is earlier." RCW 42.17A.205(1). The plaintiffs filed multiple contemporaneous documents soliciting pledges for "BIAW" as well as documents stating that pledges were made "to BIAW." *E.g.,* CP at 419, 432, 433, 435. This includes, for example, an e-mail from Daimon Doyle, then BIAW and BIAW-MSC president, dated March 12, 2007, stating, "Attached are the following documents: the formal resolution (rossi-lution) that we will be asking our 15 locals to support as well as some talking points . . . . We . . . need to be extra careful . . . since Dino is not a declared candidate we can't raise money for him therefore all official references are for a '08 candidate for Governor." CP at 410. The "rossi-lution" itself stated:

> WHEREAS BIAW is committing 100% of excess retro dollars to the 2008 gubernatorial election,
> WHEREAS participation of local associations is necessary for success,
> NOW THEREFORE BE IT RESOLVED THAT,

19

The following local associations pledge that all Retro Marketing Assistance funds received in 2007, beyond the amount budgeted for the year, will be sent to the BIAW and placed in the BIAW 2008 gubernatorial election account, to be used for efforts in the 2008 gubernatorial race.

CP at 411. The plaintiffs also point to meeting minutes of local associations that appear to make pledges directly to BIAW. For example, "[i]t was MSPU [motion, seconded, passed, unanimous] to give BIAW the excess of budgeted funds . . . to help in the governor race in 2008." CP at 433. Numerous additional documents— e-mails, meeting minutes, agendas, and organizational resolutions—also state that "BIAW" is soliciting funds to support its candidate in the upcoming election. *See generally* CP at 410-55.

The Court of Appeals and BIAW explain that this evidence does not prove anything about BIAW's intentions or expectations because "BIAW submitted evidence that 'BIAW' was used generically to refer to BIAW-MSC, BIAW, or both." *Utter*, 176 Wn. App. at 656. Therefore, "[t]he documents to which Utter and Ireland point fail to create an issue of fact." *Id.*

BIAW's premise does not lead to its conclusion. Instead, the fact that "BIAW" could refer to either or both BIAW and BIAW-MSC means that the use of "BIAW" in the documents at issue does not clarify to which organization the documents refer. The admittedly dual meaning of "BIAW" means that two

20

interpretations are possible.[7] It leaves an open question of fact about which interpretation is correct in each context. The BIAW's officers' declarations explaining that BIAW was really asking the local organizations to pledge to ChangePAC, not BIAW, *e.g.*, CP at 153, are not sufficient to support summary judgment in light of the plaintiffs' evidence, either. As the plaintiffs point out, the ultimate collection of the pledged funds and distribution to ChangePAC, which does seem to have been accomplished by BIAW-MSC, occurred after the date that the plaintiffs first filed their complaint with the AG's office. And, as noted above, the legal question is which organization had the *expectation* of receiving contributions. The ultimate acquisition of such funds may certainly be a fact relevant to determining whether an organization expected to receive funds; similarly, BIAW's practice of using "BIAW" to refer to both "BIAW" and "BIAW-MSC" is also a fact relevant to making that determination. But neither fact is dispositive, since BIAW itself acknowledges that "BIAW" sometimes really does mean just "BIAW."

Plaintiffs have established a genuine issue of material fact that precludes summary judgment on the contribution prong.

2. Expenditure Prong

BIAW argues that for plaintiffs to prove BIAW is a "political committee"

---

[7] *See, e.g., Anthis v. Copland*, 173 Wn.2d 752, 756, 270 P.3d 574 (2012) (statute subject to two reasonable interpretations is ambiguous).

under the expenditure prong, plaintiffs must show that (1) BIAW made or expected to make expenditures in support of a candidate *and* (2) BIAW had "the primary purpose" of supporting an election candidate or initiative. We deal with each argument in turn.

i.      There Is a Material Question of Fact about Whether BIAW (as Opposed to BIAW-MSC) Expended or Expected To Expend Funds

The plaintiffs argue that BIAW, not BIAW-MSC, expected to and then actually made the expenditures at issue here. The plaintiffs point to the doubtful ownership of the ROII funds (for example, if BIAW receives the funds and then gives them to BIAW-MSC with the express purpose that BIAW-MSC spend them to help elect Dino Rossi, who is "expending" those funds?). They also rely on a number of documents that BIAW filed with the PDC stating that BIAW was expending funds. For example, one typical document states that the "Building Industry Assn of WA" expended $233,648.89 to support candidate Dino Rossi. CP at 253.

BIAW responds that this expenditure, and the other documented expenditures also listing "BIAW" as the entity expending funds, was really made by BIAW-MSC—but there was not enough room on the PDC forms to fill in the full name. BIAW further asserts that the PDC investigation found that it was BIAW-MSC that expended the funds, not BIAW, and that that is dispositive.

The Court of Appeals agreed with BIAW. It stated that most of the plaintiffs' documents did not create any issue of fact as to the expenditure prong,[8] and it relied on the PDC report that formed the basis for the AG's decision not to sue BIAW. *Utter*, 176 Wn. App. at 658.[9]

The concurrence/dissent similarly argues, "In this circumstance, we should defer to the PDC's findings because of its expertise in this area, and particularly because of the PDC's fact-finding role, in which it weighed and evaluated conflicting evidence, in reaching its determination that only the BIAW subsidiary, BIAW-MSC, qualified as a political subcommittee." Concurrence/dissent at 4. The concurrence/dissent also states that the PDC is "the agency created by and charged with enforcing the FCPA." Concurrence/dissent at 6.

The Court of Appeals and the concurrence/dissent err for three reasons: first,

---

[8] The Court of Appeals found there was a factual question as to the expenditure prong based on BIAW's 2008 Internal Revenue Service (IRS) form, which stated that BIAW made political expenditures in the amount of $165,214. *Utter*, 176 Wn.2d at 659. BIAW argues that was simply a mistake and therefore does not create an issue of fact. The plaintiffs have, however, likely raised an issue of fact as to who made the expenditures based on BIAW's submissions to the PDC naming itself and not BIAW-MSC. Again, BIAW's argument that "BIAW" can refer to either entity or both entities seems to create, rather than resolve, the factual question. Also, BIAW's argument that its 2008 IRS form contained a clerical error might well be accepted by a fact finder but, in light of all the other evidence, it is not sufficient to support summary judgment.

[9] While the trial court in this case did not explain its reasoning, its summary judgment order states that it considered the PDC's "Executive Summary and Staff Analysis" and the PDC's "Report of Investigation." CP at 833.

the PDC's legal conclusions here concern statutory interpretation of the FCPA, and we therefore apply de novo, not deferential, review; second, the PDC's factual conclusions about whether a set of documents definitively establishes BIAW's independence from BIAW-MSC is neither technical nor complex, so we need not defer; and third, the PDC's decision on this point was not an "agency determination" and thus once again, we do not defer.

First, the PDC's conclusion that BIAW is not a political committee is based at least in part on its interpretation of the FCPA, a statute. "Where statutory construction is concerned, the error of law standard applies." *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002) (citing RCW 34.05.570(3)(d)). To apply this standard, "the court determines the meaning and purpose of a statute de novo, although in the case of an ambiguous statute which falls within the agency's expertise, the agency's interpretation of the statute is accorded great weight, provided it does not conflict with the statute." *Id.* (citing *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000)). Because the FCPA is not ambiguous, we need not defer to the PDC's conclusion that BIAW was not a political committee in our de novo review.

Second, we recognize that the PDC based its conclusion partly on an assessment of facts; but "substantial deference to agency views" applies mainly to factual matters that are "complex, technical, and close to the heart of the agency's

24

expertise." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997).

The question about the meaning of documents listing "BIAW," not "BIAW-MSC,"

is neither complex nor technical. The question before us—whether documents

listing "BIAW," not "BIAW-MSC," as the entity that solicited and obtained pledges

merely raises a material question of fact about whether they mean "BIAW" or

"BIAW-MSC"—is even less complex or technical. The limited amount of technical

knowledge required to evaluate these documents also militates against judicial

deference.

Finally, the PDC's investigation informing the AG of the beliefs of the PDC

staff was not an agency determination to which courts must defer. It was a decision

*against* taking action and *against* seeking a final determination. RCW 42.17A.755

states:

> (1) The commission may (a) determine whether an actual violation of this chapter has occurred; and (b) issue and enforce an appropriate order following such a determination.

> (2) The commission, in cases where it chooses to determine whether an actual violation has occurred, shall hold a hearing pursuant to the administrative procedure act, chapter 34.05 RCW, to make a determination. Any order that the commission issues under this section shall be pursuant to such a hearing.

> (3) In lieu of holding a hearing or issuing an order under this section, the commission may refer the matter to the attorney general or other enforcement agency as provided in RCW 42.17A.105.

. . . .

> (6) An order issued by the commission under this section shall be subject to judicial review under the administrative procedure act, chapter 34.05 RCW.

Thus, when the PDC chooses to determine if a violation occurred, it must either hold an official hearing under the Administrative Procedure Act or refer the matter to the AG in accordance with RCW 42.17A.105. RCW 42.17A.105(5), the only section relevant to the nondetermination at issue here, states that the PDC shall, "[u]pon complaint or upon its own motion, investigate and report apparent violations of this chapter to the appropriate law enforcement authorities." A report concluding that the PDC does not believe any violation requires reporting or other agency action does not fall under any of the statutory categories that we could interpret as constituting an agency action.

Indeed, as a practical matter, if the trial court can rely on the PDC's conclusions to grant summary judgment, the effect will be similar to the effect of holding that a PDC investigation alone precludes citizen suits. Such a holding would make citizen suits virtually impossible because it is precisely those situations where the PDC finds no violation occurred that the AG will likely refuse to sue. The Court of Appeals therefore erred when it deferred to the PDC report.

Without deference to the PDC report, we are left with BIAW's argument that the actual expenditures all came from BIAW-MSC, not BIAW. But RCW

26

42.17A.205(1) states that a political committee must register "within two weeks after the date the committee first has *the expectation of* . . . making expenditures in any election campaign." (Emphasis added.) And a political committee includes an organization "having *the expectation of* . . . making expenditures." RCW 42.17A.005(37). The plaintiffs' evidence that BIAW, not BIAW-MSC, solicited pledges from its local associations, and that those local associations pledged "to BIAW," not BIAW-MSC or ChangePAC, raises a question of fact as to whether BIAW had an expectation of making political expenditures, regardless of who actually ended up expending the funds.

  ii. We Endorse the "A" Primary Purpose Test and Hold That There Is a Material Question of Fact about Whether BIAW (as Opposed to BIAW-MSC) Satisfied That Test

    a. The Reporting Statute Contains No "Purpose" Test At All; To Construe That Statute as Constitutional, We Must Infer "a Primary Purpose" Test

RCW 42.17A.005(37) does not say anything about whether an entity will be treated as a "political committee" even if influencing an election is a minor part of its mission. This is, however, an important First Amendment issue, and both parties seem to agree that *some* "purpose" test must be, or has been, added on to the statute to construe it properly.

In this case, the Court of Appeals described the applicable "purpose" test as follows: "an organization must have as its primary purpose, or *one of its primary*

*purposes*, to affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions." *Utter*, 176 Wn. App. at 657 (emphasis added) (citing *Dan J. Evans*, 86 Wn.2d at 509). It explicitly declined to address BIAW's contention that this "one of its primary purposes" test violates the First Amendment. *Id.* at 654 n.4.

The Court of Appeals correctly determined—in dicta—that the numerous statements made by BIAW officials and submitted as evidence by plaintiffs raised a question of fact as to whether *a* primary purpose of the BIAW was to elect Dino Rossi. But the evidence does not appear to raise a question of fact as to whether that was *the* primary purpose of BIAW—BIAW existed long before the 2007-2008 campaign season and has many other purposes. *See, e.g.,* CP at 153 (declaration of Tom McCabe, former BIAW officer, stating that BIAW's main purposes are "membership and education"). So we cannot resolve the issue of whether there is a question of fact without determining the correct test first.

BIAW argues that permitting regulation based on *a* primary purpose of the entity being the support or opposition of a "candidate or . . . ballot proposition," RCW 42.17A.005(37), as opposed to *the* primary purpose of that entity, is unconstitutional under *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (per curiam). Specifically, BIAW argues that defining "political committee" to include organizations with "a" primary purpose of supporting a candidate rather

than "the" primary purpose of supporting a candidate violates the First Amendment to the United States Constitution because it chills political speech. Plaintiffs, for their part, would also read some "purpose" test into the statute—they cite the "a" primary purpose test first stated by this court in *Dan J. Evans* and then adopted by the Court of Appeals in *EFF*, in both cases without discussion of any constitutional implications. BIAW relies on a Fourth Circuit case adopting the "the primary purpose" test to satisfy First Amendment concerns, *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 289 (4th Cir. 2008). BIAW's Suppl. Br. at 14-15. Plaintiffs point out, however, that the exact argument BIAW makes was rejected by the Ninth Circuit two years later in *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990 (9th Cir. 2010). That case specifically addressed what it perceived as Washington's "a primary purpose" test and concluded it did not violate the First Amendment: "We disagree with Human Life's reading of *Buckley*, and we reject its invitation to adopt a bright-line rule prohibiting all regulation of groups with 'a' primary purpose of political advocacy." *Brumsickle*, 624 F.3d at 1009. *Brumsickle* and *Leake* thus represent a circuit split on this issue.

There is likely no question of fact about whether *the* primary purpose of BIAW is to support candidates or initiatives. Thus we must decide whether to expressly approve the purpose test we first enunciated, though arguably as dicta, and certainly without considering the constitutional implications, in *Dan J. Evans*—that

29

the support of a candidate or initiative must be "the primary or one of the primary purposes" of a person expending funds for the State to subject them to regulation as a political committee based on their expected expenditures. 86 Wn.2d at 509 (emphasis omitted).

Seven circuits have addressed this question. *Brumsickle*, as noted above, considered the question in the context of Washington law. It applied the "exacting scrutiny" standard of review mandated by *Buckley*, 424 U.S. at 16, and *Citizens United v. Federal Election Commission*, 558 U.S. 310, 366-67, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), for evaluating the constitutionality of the campaign disclosure (as opposed to contribution or expenditure limit) statutes, ruled that there was a substantial relationship between Washington's "informational interest and its decision to impose disclosure requirements on organizations with a primary purpose of political advocacy," and approved of what it perceived as our "a" primary purpose test. *Brumsickle*, 624 F.3d at 1009-11. *Brumsickle* was followed by the First Circuit in *National Organization for Marriage v. McKee*, 649 F.3d 34, 59 (1st Cir. 2011). That court stated that endorsement of the "the" primary purpose test could "yield perverse results" because

> "a small group with the major purpose of re-electing a Maine state representative that spends $1,500 for ads could be required to register as a [political action committee (PAC)]. But a mega-group that spends $1,500,000 to defeat the same candidate would not have to register

because the defeat of that candidate could not be considered the corporation's major purpose."

*Id.* (quoting *Nat'l Org. for Marriage v. McKee*, 723 F.Supp.2d 245, 264 (D. Me. 2010)). The Seventh Circuit agreed with *Brumsickle* and *McKee* and held that state campaign disclosure laws are not overbroad for lacking "the major purpose" test. *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 491 (7th Cir. 2012). And, most recently, the Second Circuit followed suit, stating, "We join the Circuits that have considered PAC definitions in this context after *Citizens United* and hold that the Constitution does not require disclosure regulatory statutes to be limited to groups having 'the major purpose' of nominating or electing a candidate." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 136 (2d Cir. 2014). Thus, four of the seven circuits that have addressed the question have found that state disclosure requirements need not be limited to organizations with "the" major (or primary) purpose of electioneering to comply with the First Amendment.

The Eighth Circuit has not directly answered the question, but it has recognized the circuit split and appears to engage in a sort of balancing test. It has held that "the major purpose" of an organization is an "important consideration" in determining the extent of permissible regulation. *Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 592 (8th Cir. 2013). It also found, however, that some

regulation is permissible without "[the] major purpose" test, depending on the type and extent of regulation. *Id.* at 594.

The Fourth and Tenth Circuits have rejected state disclosure requirements that lack "the major purpose" test. The Tenth Circuit, though, does not appear to distinguish between a test that uses "a" major purpose and one that uses "the" major purpose. *See Colo. Right To Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1155 (10th Cir. 2007) (referring to legislation that used the phrase "a major purpose" as including "the very 'major purpose' test at issue"). Thus it appears that only the Fourth Circuit has unequivocally rejected a state law that requires "a" primary purpose of electioneering rather than "the" primary purpose to subject a campaigning entity to filing and disclosure requirements. *Leake*, 525 F.3d at 287 ("the importance the plaintiffs attach to the definite article is correct"). Since *Leake* was decided, the First, Second, Seventh, and Ninth Circuits have rejected its reasoning.

We agree with the majority of circuits that have addressed this issue. As discussed, the statutory definition of "political committee" contains no limitation regarding the purpose of such a committee. Reading some stringent purpose requirement, like the "a" primary purpose test, into our statute is necessary to satisfy First Amendment concerns. Adopting the even more stringent "the" primary purpose test, however, would likely contravene the intent of the voters to extend the

reach of this state's filing and disclosure requirements as much as possible and is not necessary to satisfy the First Amendment. *Brumsickle*, 624 F.3d at 1009. Additionally, Washington courts have previously espoused an "a" primary purpose test. *Dan J. Evans*, 86 Wn.2d at 509; *accord EFF*, 111 Wn. App. at 598-99.

> b. Plaintiffs Have Raised a Genuine Issue of Fact under Washington's "a" Primary Purpose Test

The plaintiffs have established a question of fact as to whether BIAW had the support of a candidate as one of its primary purposes during the 2007-2008 campaign season. For example, the plaintiffs submitted BIAW board of director meeting minutes stating that "BIAW's number one priority this campaign season would be to help Rossi get elected." CP at 608. A letter from BIAW's 2008 president Brad Spears to BIAW members whose memberships were about to expire states that "BIAW is putting forth the largest political effort in the entire history of the association 'to re-elect' Dino Rossi as governor." CP at 406. Minutes of a local association's directors' meeting state, "On behalf of BIAW, Brad Spears spoke to the Board [and] talked about how we have a Governor who is unfriendly to our industry . . . . BIAW has decided that with this scenario all of our efforts for the next two years need to be expended on electing a new Governor in 2008." CP at 418-19. And an issue of BIAW's newsletter, *Building Insight*, contains an article titled "An

33

Open Letter to all [Master's Building Association] Members from BIAW Senior Officers," which states:

> As the Building Industry Association of Washington's (BIAW) 2008 Senior Officers, it is a pleasure and an honor to serve as the leaders of this great association. *Our primary goal* this year has been to unify BIAW members and local associations behind a coordinated, all out effort to elect Dino Rossi as Governor. . . . BIAW is running an aggressive and truthful campaign to elect Dino. It is our hope and desire that you will join us in this endeavor and encourage your local association (MBA of King and Snohomish Counties) to actively participate with us to achieve this goal.

CP at 368 (emphasis added).

BIAW argues that all the statements by BIAW officers about BIAW were in fact statements in their capacities as BIAW-MSC officers about BIAW-MSC. We discussed this argument above; it is an argument for the trier of fact. The BIAW officer declarations saying that BIAW's main purposes are "membership and education," CP at 153, are not sufficient to support a grant of summary judgment in light of the plaintiffs' evidence.

> B. *The Decision in* WBBT *Does Not Collaterally Estop BIAW from Denying That It Owns the Funds at Issue Here*

The parties argue about whether a recent case, *In re Washington Builders Benefit Trust*, 173 Wn. App. 34, 45, 293 P.3d 1206 (*WBBT*), *review denied*, 177 Wn.2d 1018 (2013), conclusively proves that BIAW owned the ROII funds that were handled through BIAW-MSC's accounts. *WBBT* concerned a trust established by

BIAW, the Washington Builders Benefit Trust, for the purpose of holding and investing the ROII funds BIAW got from L&I under its retro program. The *WBBT* case is extremely complicated and involved complaints by participants in the retro program that BIAW and BIAW-MSC, trustees of the trust, were "retaining interest earned on deposited funds, commingling funds, and failing to provide statutorily required accountings" as well as "violat[ing] their fiduciary duties under the trust agreement in expending funds earmarked for marketing and promotion of the plan." *WBBT*, 173 Wn. App. at 43. Part of the case involved determining what organizations controlled the funds that were supposed to go into the trust and when they controlled them. *WBBT* found, for example, that "[i]n July of each year, the BIAW–Member Services Corporation transferred an additional 10 percent marketing assistance fee to its money marketing accounts, which fee was distributed to BIAW." *Id.* at 50-51.

The plaintiffs argue that BIAW is collaterally estopped from denying it owns the funds at issue here because that issue was litigated in *WBBT* and BIAW lost. But, as BIAW points out, a prerequisite to application of collateral estoppel is that the identical issue was litigated. BIAW is correct that the issue in *WBBT* is not identical to the issue here: who controls funds for purposes of determining whether a trustee violated fiduciary duties or contractual obligations is not the same issue as who expended or expected to expend funds for political committee registration

purposes. In addition, in the absence of collateral estoppel, plaintiffs cannot rely on *WBBT* to create an issue of fact any more than BIAW can rely on the PDC investigation to argue that there is no issue of fact.

C. *We Do Not Reach BIAW'S Argument That Reporting Requirements for Political Committees Would Be Unconstitutionally Onerous as Applied to BIAW*

BIAW argues that the reporting requirements for political committees would be unconstitutionally onerous as applied to BIAW if it were considered a "political committee."

As discussed above, BIAW is correct that political committee registration requirements are subject to "exacting scrutiny." *Brumsickle*, 624 F.3d at 1005 (citing *Citizens United*, 558 U.S. at 366-67). Under exacting scrutiny, the question of whether any applicable registration requirements, as applied to BIAW during any relevant time period, would have resulted in an unconstitutionally onerous burden involves a strong factual component—it would require a court to address the specific reporting requirements and balance the burden of the disclosure requirements for the specific time period in that particular case against the government's interest in providing the public with campaign finance information. *See Brumsickle*, 624 F.3d at 1008, 1013. We do not have a sufficient factual record to determine whether any applicable reporting requirements as applied to BIAW at the relevant time would have been onerous or would have been substantially related to the government's

interest, nor have the parties briefed this issue in depth. This constitutional issue is thus not ripe for review.

### D. The "Attribution" Statute Applies Only to Aggregate Contributions and Not to the Definition of "Political Committee"

Plaintiffs argue that the FCPA permits automatic attribution of contributions or expenditures by one organization to a parent or controlling organization for purposes of defining a "political committee." BIAW argues that the FCPA permits such automatic "attribution" only for purposes of contribution limits and not for purposes of determining whether an organization has received contributions or made expenditures that require it to register as a political committee.[10]

The plaintiffs rely mainly on just one sentence from RCW 42.17A.455, which states, in relevant part:

> For purposes of this chapter:
>
> . . . All contributions made by a person or political committee whose contribution or expenditure activity is financed, maintained, or controlled by a trade association, labor union, collective bargaining organization, or the local unit of a trade association, labor union, or collective bargaining organization are considered made by the trade association, labor union, collective bargaining organization, or local unit of a trade association, labor union, or collective bargaining organization.

---

[10] The following organizations have submitted an amici briefing in support of BIAW's argument on this particular point: Washington State Labor Council, SEIU Healthcare 775NW, UFCW 21, Washington Education Association, SEIU Healthcare 1199NW, and SEIU Local 925.

RCW 42.17A.455(2). The plaintiffs assert that this statute applies to the definition of "political committee"—"any person . . . having the expectation of receiving contributions or making expenditures in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17A.005(37). "'Expenditure' includes a . . . contribution." RCW 42.17A.005(20). Thus, plaintiffs argue that since "[a]ll contributions made by a person or political committee whose contribution or expenditure activity is . . . controlled by a trade association . . . are considered made by the trade association," RCW 42.17A.455(2), if BIAW-MSC made contributions or expenditures and plaintiffs show BIAW controlled BIAW-MSC, then all of BIAW-MSC's contributions or expenditures are automatically attributed to BIAW. Plaintiffs' argument is largely based on the fact that RCW 42.17A.455 begins, "For purposes of this chapter" and the "chapter" is all of chapter 42.17A RCW. They point out that there is no good reason to apply this "attribution" statute only to contribution limits, except that it would be very inconvenient for the defendants.

BIAW counters that the attribution statute does not apply to the definition of "political committee" but only to limits on campaign contributions. BIAW points out that the statute at issue was created by a citizens' initiative 20 years after the definition of "political committee" was codified (also as a result of a citizens' initiative), and that the text of the initiative in the voter's pamphlet gave no indication that the initiative was intended to expand registration obligations. Rather, BIAW

argues, the initiative was labeled "AN ACT Relating to the regulation of political contributions and campaign expenditures." LAWS OF 1993, ch. 2, § 1 (Initiative Measure No. 134, approved Nov. 3, 1992). Part III of the initiative, where the attribution rule appears, is labeled "CONTRIBUTIONS." *Id.* § 4. And the other sections in Part III address contribution limits, not reporting requirements. Further, BIAW argues that the legislation contains a statement of the voters' intent (which also appeared in the language of the initiative):

> (2) By *limiting campaign contributions*, the people intend to:
>
> (a) Ensure that individuals and interest groups have fair and equal opportunity to influence elective and governmental processes;
>
> (b) Reduce the influence of large organizational contributors; and
>
> (c) Restore public trust in governmental institutions and the electoral process.

RCW 42.17A.400 (emphasis added).[11]

The Court of Appeals agreed with the BIAW that the attribution statute did not apply to the definition of "political committee" but only to caps on campaign

---

[11] BIAW also contends that our court has acknowledged that the attribution statute was intended to apply to contribution limits, not to the determination of who is a "political committee." We did state that "[RCW 42.17A.455] specifies a relationship between entities in which those entities are considered a single entity *for purposes of campaign contribution limits*." *Edelman v. State ex rel. Pub. Disclosure Comm'n*, 152 Wn.2d 584, 590, 99 P.3d 386 (2004) (emphasis added). However, that statement was likely dicta—the court in *Edelman* was not presented with the question whether the attribution statute could apply outside the campaign contribution limits context.

contributions. The Court of Appeals and BIAW rely heavily on *American Legion Post No. 149 v. Washington State Department of Health*, 164 Wn.2d 570, 192 P.3d 306 (2008), to reach this conclusion. In *American Legion*, this court ignored a statutory provision resulting from an initiative that stated that the statute applied to "'[t]his chapter.'" *Id.* at 586-91 & n.7. But we held that the phrase did not mean what it said because "such a reading would eviscerate much of the [Smoking in Public Places] Act[, ch. 70.160 RCW,] and interfere with the express intent of the voters." *Id.* at 588-89. Those are strong words. And even so, there was a vigorous dissent signed by several justices arguing that "this chapter" is entirely unambiguous. *Id.* at 637 (J.M. Johnson, J., dissenting). By contrast, applying the attribution statutes to the definition of "political committee" would not eviscerate the FCPA or interfere with the express intent of the voters to "(a) [e]nsure that individuals and interest groups have fair and equal opportunity to influence elective and governmental processes; (b) [r]educe the influence of large organizational contributors; and (c) [r]estore public trust in governmental institutions and the electoral process." RCW 42.17A.400(2).

Nevertheless, the bulk of the textual analysis supports BIAW's argument. The initiative's statement of intent declares that the people intend to accomplish the goals of the initiative "[b]y limiting campaign contributions." RCW 42.17A.400(2). The initiative itself contains no indication that it would impose expanded reporting

requirements related to the definition of "political committee," and the sections surrounding the attribution section all relate to limits on making contributions.

Further, a comparison of the definition of "political committee" in RCW 42.17A.005(37) with the attribution rule in RCW 42.17A.455 reveals that the two statutes are difficult to reconcile if they are supposed to apply to each other. For example, a political committee has an expectation of "*receiving* contributions or *making* expenditures," RCW 42.17A.005(37) (emphasis added), while a "contribution *made by*" a person can be considered "*made by*" a controlling entity under RCW 42.17A.455(2) (emphasis added). Political committees are defined by making expenditures, not making contributions. Cross-referencing is cumbersome, if not impossible. This favors BIAW's argument that the statutes were never intended to be read together.

Finally, plaintiffs' proposed interpretation poses constitutional problems. As discussed above, *Brumsickle* upheld Washington's disclosure laws on the ground that they satisfy the First Amendment's exacting scrutiny test, which examines whether the law's requirements "are substantially related to a sufficiently important governmental interest." *Brumsickle*, 624 F.3d at 1005. Washington's disclosure laws are constitutional *on their face* because they serve an important government interest and use a narrowly tailored means that does not force overburdensome or duplicative reporting. *Id.* at 1013. If we interpret the second sentence of RCW

42.17A.455(2)—the attribution rule—to apply to the definition of "political committee," then that definition of "political committee" is no longer narrowly tailored. A union or trade organization with "a" primary purpose of electioneering, which never received or expected election "contributions" itself but did speak freely to its members about how to vote, could nevertheless become subject to the disclosure requirements. Such an application of the attribution statute would significantly broaden the definition of "political committee" and thus would arguably flunk the First Amendment test under not just *Brumsickle* but also *Buckley* (upon which *Brumsickle* is based).

We construe statutes to avoid constitutional doubt. *State v. Robinson*, 153 Wn.2d 689, 693-94, 107 P.3d 90 (2005). This interpretive principle of constitutional avoidance mandates that we choose the interpretation of the attribution rule that limits its applicability to aggregation of contributions. That resolution avoids any constitutional problem and also comports with the stated intent of the voters and the statutory scheme as a whole.[12]

## CONCLUSION

---

[12] Plaintiffs briefly make the same argument about another "[a]ttribution" statute, RCW 42.17A.460. (Boldface omitted.) But that statute does not include the language "for the purposes of this chapter." Without that language, the plaintiffs' argument is significantly less convincing than the one we rejected above, and we therefore reject that one as well.

We (1) hold that the PDC's investigation did not preclude the plaintiffs' citizen suit because the AG's referral of the plaintiffs' complaint to the PDC did not "commence an action" within the meaning of the citizen suit statute, (2) hold that the plaintiffs have presented evidence sufficient to raise a genuine issue of material fact as to the contribution prong of the "political committee" definition, (3) adopt the version of the "primary purpose" test that includes organizations that have the support of a candidate or initiative as "one of" their primary purposes and hold that, consequently, the plaintiffs have presented evidence sufficient to raise a genuine issue of material fact as to the expenditure prong of the "political committee" definition, (4) hold that the *WBBT* case does not collaterally estop BIAW from denying ownership of the funds at issue, (5) decline to reach the constitutional "onerous burden" issue, which is not ripe for review, and (6) hold that the so-called "attribution" rule applies only to contribution limits and not to the determination of who is a "political committee." We reverse the Court of Appeals and remand this case for further proceedings in the superior court.

_____
George McCall, J.

WE CONCUR:

_____      _____
                                             Wiggins, J.

_____      _____
                                             González, J.

Fairhurst, J.                     Johanson, J.P.T.
_____      _____

Stephens, J.                     Yu, J.
_____      _____

No. 89462-1

MADSEN, C.J. (concurring/dissenting)—I agree with the majority that the attorney general's (AG) referral of the plaintiff's complaint to the Public Disclosure Commission (PDC) did not "commence an action" within the meaning of the citizen suit statute, RCW 42.17A.765(4). Nevertheless, in my view, neither reversal of summary judgment nor further proceedings are warranted in this case because the AG's commencement of a lawsuit against Building Industry Association of Washington's (BIAW) nonprofit arm precludes a further citizen suit against BIAW under RCW 42.17A.765(4)(a)(i) and because the PDC's determination resolves any fact question regarding BIAW's culpability. I would affirm the trial court's grant of summary judgment.

Discussion

The Fair Campaign Practices Act (FCPA), chapter 42.17A RCW, imposes specified reporting obligations on "political committees," as defined by RCW 42.17A.005(37) (discussed below). The task of enforcing those campaign disclosure requirements falls primarily to the State. *See, e.g.*, RCW 42.17A.755 (authorizing the PDC to investigate alleged violations, initiate administrative enforcement proceedings,

and levy fines not to exceed $10,000), .750(2) (authorizing the PDC to refer violators for criminal prosecution), .765(1)-(3) (authorizing the AG and other prosecuting authorities to investigate and bring civil enforcement actions). The act also grants limited enforcement powers to citizens under the citizen suit provision, RCW 42.17A.765(4). That provision, however, precludes citizens from filing a civil lawsuit unless the "[t]he attorney general and the prosecuting attorney have failed to commence an action hereunder" and "have in fact failed to bring such action" within the statutory time periods. RCW 42.17A.765(4)(a)(i), (iii).

The following relevant facts are undisputed. BIAW is a statewide nonprofit trade association representing the interests of local building association members. BIAW-Member Services Corporation (BIAW-MSC) is a wholly owned subsidiary of BIAW and is a for-profit corporation formed by BIAW in 1993 to run the Return on Industrial Insurance Program[1] for BIAW members. BIAW and BIAW-MSC share the same staff and officers, and such personnel commonly refer to both entities by the generic shorthand "BIAW." Following an "exhaustive"[2] investigation by the PDC, prompted by plaintiffs' claims that BIAW and its subsidiary were violating the FCPA, the PDC issued a report finding only that a discrete portion of the funds handled by BIAW-MSC within the 2007-2008 election cycle fell within FCPA reporting requirements; the report otherwise exonerated the BIAW organization. Based on that report, the AG commenced suit

---

[1] BIAW-MSC manages and processes BIAW members' Department of Labor and Industries overpayment refunds, referred to as the ROII or "retro" program. Clerk's Papers (CP) at 175.
[2] Plaintiffs described the PDC's investigation to the trial court as "exhaustive." CP at 215 (Pl.'s Opp. To Mot. for Summ. J. at 4).

2

against BIAW-MSC for violation of the FCPA. Thereafter, the plaintiffs filed a citizen's suit against BIAW for violations of the FCPA. The trial court granted BIAW's summary judgment motion, and the Court of Appeals affirmed, holding that the plaintiffs' citizen suit is barred because the AG commenced "an action" precluding a citizen suit when the AG forwarded the plaintiffs' letter to the PDC for investigation. *Utter v. Bldg. Indus. Ass'n of Wash.*, 176 Wn. App. 646, 674, 310 P.3d 829 (2013).

The majority reverses the Court of Appeals and holds that "RCW 42.17A.765 precludes a citizen suit only where the AG or local prosecuting authorities bring *a suit* themselves, and it does not preclude a citizen suit where the AG declines to sue." Majority at 13 (emphasis added). In so holding, the majority relies on the plain language of the citizen suit statute, which provides in relevant part "[a] person . . . may . . . bring . . . a citizen's action . . . *only if* . . . [t]he attorney general and the prosecuting attorney have failed to commence *an action* hereunder within forty-five days after the [specified] notice." RCW 42.17A.765(4)(a)(i) (emphasis added); *see also* majority at 8. This provision "seeks to give private citizens . . . the right to enforce the Act *only* if the state has not acted." *State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 111 Wn. App. 586, 608, 49 P.3d 894 (2002) (*EFF* I) (emphasis added); *see also State ex rel. Evergreen Freedom Found. v. Nat'l Educ. Ass'n*, 119 Wn. App. 445, 453, 81 P.3d 911 (2003) (*EFF* II) (noting that the "clear intent" of the citizen's suit statute is that "the AG or county prosecutor's 'commencement of an action' within the proscribed time period precludes a citizen's action").

Here, the AG *did* commence a timely lawsuit against BIAW, via its for-profit subsidiary. The AG filed that lawsuit on the basis of the PDC determination that BIAW-MSC qualified as a political committee and had failed to comply with the reporting requirements of the FCPA.[3] Accordingly, the AG filed suit against the BIAW subsidiary that the PDC's investigation found to be culpable.

In this circumstance, we should defer to the PDC's findings because of its expertise in this area and particularly because of the PDC's fact-finding role, in which it weighed and evaluated conflicting evidence, in reaching its determination that only the BIAW subsidiary, BIAW-MSC, qualified as a political committee. "[S]ubstantial judicial deference to agency views [is] appropriate when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 396, 932 P.2d 139 (1997). "'[I]t is well settled that due deference must be given to the specialized knowledge and expertise of an administrative agency.'" *Port of Seattle v. Pollution Control Hr'g's Bd.*, 151 Wn.2d 568, 595, 90 P.3d 659 (2004) (alteration in original) (quoting *Dep't of Ecology v. Pub. Utility Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S .Ct. 1900, 128 L. Ed.

---

[3] The PDC concluded that "[d]uring 2006-June 2008, BIAW did not solicit or receive contributions to support or oppose candidates or ballot propositions, nor did it contribute to candidates or political committees or use its general treasury for other campaign-related expenditures." CP at 57 (emphasis omitted). The PDC further determined that "the solicitation, receipt, and retention of local association Retro program refunds by BIAW-MSC in the amount of $584,527.53" for campaign purposes qualified BIAW-MSC as a political committee, triggering reporting requirements for the noted funds. CP at 59.

4

2d 716 (1994)). "In the course of judicial review, due deference will be given to the specialized knowledge and expertise of the administrative agency." *English Bay Enters., Ltd. v. Island County*, 89 Wn.2d 16, 21, 568 P.2d 783 (1977); *Schuh v. Dep't of Ecology*, 100 Wn.2d 180, 187, 667 P.2d 64 (1983) (same); *see also Cashmere Valley Bank v. Dep't of Revenue*, 181 Wn.2d 622, 634-37, 334 P.3d 1100 (2014) (agency determination is not binding on this court, but its adjudicatory action is generally granted some deference; considerable deference given to interpretation by agency charged with enforcing statute; we accord deference to an interpretation of law in matters involving the agency's special knowledge and expertise); *see also PT Air Watchers v. Dep't of Ecology*, 179 Wn.2d 919, 925, 319 P.3d 23 (2014) (burden of demonstrating the invalidity of agency action is on the party asserting invalidity; this court affords deference to agency's interpretation of the law where agency has specialized expertise in dealing with such issues, but this court is not bound by an agency's interpretation of statute; board's order should be upheld unless we find that the board erroneously interpreted or applied the law or the board's order is not supported by substantial evidence).

Because the AG filed suit against the BIAW subsidiary determined by the PDC experts to be culpable, the plaintiffs cannot now file a citizen's suit against a different part of that same organization. Restated, because the AG has not "failed to commence a [timely] action" against BIAW, via that organization's culpable subsidiary, the plaintiffs' citizen suit against the BIAW parent association is barred. RCW 42.17A.765(4)(a)(i);

*see also EFF* I, 111 Wn. App. at 608; *EFF* II, 119 Wn. App. at 453. For this reason alone, summary judgment to BIAW should be affirmed.

Even if the AG has not acted sufficiently against BIAW to bar suit under RCW 42.17A.765(4)(a)(i), we should nevertheless sustain the grant of summary judgment. I disagree with the majority's view that summary judgment is inappropriate because a fact question exits regarding whether BIAW qualified as a "political committee"[4] under the FCPA. Majority at 14. The majority holds that the plaintiffs' evidence, which names "BIAW" as soliciting pledges from its local associations, raises a question of fact regarding whether BIAW had an expectation of receiving contributions and making political expenditures. *Id.* at 18-21, 24-25. The majority's analysis relies on e-mails and local building associations' meeting minutes indicating that pledges were solicited for and made to "BIAW." *Id.* at 19-20.

This is not a case where there has yet to be a weighing of evidence and determination of witnesses' credibility. Such determination and fact-finding has already been performed by the PDC, the agency created by and charged with enforcing the FCPA. *See* RCW 42.17A.100 (establishing the PDC), .105 (describing the duties of the PDC); *see also EFF* I, 111 Wn. App. 586, 606. The FCPA empowers the PDC to "investigate . . . apparent violations of [the FCPA]" upon complaint or its own motion and to "[e]nforce [the FCPA] according to the powers granted it by law." RCW

---

[4] The FCPA defines "political committee" as "any person (except a candidate or an individual dealing with his or her own funds or property) having *the expectation of receiving contributions or making expenditures* in support of, or opposition to, any candidate or any ballot proposition." RCW 42.17A.005(37) (emphasis added).

42.17A.105(5), (8). Powers granted to the PDC include, but are not limited to, the authority to "(a) determine whether an actual violation of this chapter has occurred; and (b) issue and enforce an appropriate order following such a determination." RCW 42.17A.755(1). In lieu of issuing such order, the PDC may refer the matter to the AG. RCW 42.17A.755(3).

In its report, the PDC noted "Examples of Solicitation *by BIAW-MSC*," which included e-mails and minutes from local builders associations. Clerk's Papers at 67 (emphasis added and omitted). The report explained, "The emails demonstrate that these [local] associations responded to BIAW-MSC solicitation and agreed to donate a portion of their Retro program refund for use in the 2008 Governor's campaign." *Id.* Excerpts from the report noted as follows:

> Joel White, Executive Officer of the Spokane Home Builders Association: Mr. White stated in part in his July 2, 2007 e-mail: "Our Board of Directors *authorized BIAW* to keep any proceeds from the ROII program over the $275,000 we budgeted in 2007 to be used for the Governor's race in 2008 . . ."
>
> Bill Quehrn, Building Industry Association of Whatcom County: Mr. Quehrn stated in part in his July 11, 2007 e-mail: "The vote was *to allow BIAW* to withhold $10,000 for our current check . . . The enthusiasm over another shot at the governor's office by Dino was unanimously welcomed."

*Id.* (emphasis added and omitted) (alterations in original). The PDC report further noted:

> Jeff Danks, Controller for the Master Builders Association of King & Snohomish Counties (MBA-K&S) confirmed in an e-mail:
>
> > "I was present at the board meeting when Mr. Doyle made his solicitation to the [MBA-K&S]. The [MBA-K&S] was asked to agree to give back *to BIAW* any amount for the 2007 ROII refund

7

above what was originally expected and that money was to be used for the 2008 Governor's race."

*Id.* (emphasis added and omitted). The PDC report also gave an example of a local board minute entry stating:

The April 30, 2007 Minutes of the MBA-K&S Board of Directors meeting state that BIAW President Daimon Doyle was in attendance and provided information about the 2007 Legislative Session. The minutes also state:

"Daimon then went on to explain the reason he was in attendance, which was to ask the Association to donate the excess proceeds of the ROII return *to BIAW*'s election fund to support a gubernatorial candidate in 2008. He discussed fundraising for the upcoming election year 2008, and stated that the senior officers introduced a resolution asking each of the 15 locals to donate the excess retro funds beyond what they budgeted to the gubernatorial fund."

*Id.* (emphasis added and omitted).

As can be seen, the PDC had before it the same type of evidence that the majority now says creates a fact question: e-mails and meeting minutes identifying "BIAW" as soliciting funds. But the PDC considered that evidence in context and as fact-finder weighed the evidence, determined the credibility of witnesses and resolved the fact question in rendering its decision.[5] The evidence supports the PDC's factual determinations, and there is no indication that the PDC misapplied any portion of the

---

[5] Although the e-mails and minute entries identified "BIAW," the PDC concluded that the solicitations were in fact made by BIAW-MSC. *See* CP at 57, 59, 67, 69, 77. In so deciding, the PDC conducted "interviews under oath" of BIAW and BIAW-MSC personnel, and additionally considered revenue reports of BIAW and BIAW-MSC and declarations by BIAW and BIAW-MSC officers, administrators, and staff. CP at 76.

8

FCPA.[6] We should defer to the PDC's determination that BIAW does not qualify as a political committee under the FCPA.

Finally, I disagree with the majority's view that the PDC report does not warrant our deference under the circumstances of this case. First, the PDC report is properly before us for consideration. In conducting our de novo review of the trial court's grant of summary judgment to BIAW, we consider the record that was before the trial court.[7] *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 253, 59 P.3d 655 (2002). Here, the PDC report was before the trial court without objection, it was argued by the parties during the summary judgment proceedings, and it was considered by the trial court in granting the summary judgment motion. Accordingly, it is proper for us to give due consideration to the PDC report.

Next, the majority says that (1) we should not defer to the PDC report to the extent that the PDC is applying the FCPA, majority at 24; (2) the PDC's factual determination of the significance of the reference to "BIAW" in e-mails and other documents does not

---

[6] The plaintiffs assert that the PDC investigation was "flawed" because the PDC "accepted at face value" BIAW's contention that BIAW-MSC, and not BIAW, controlled and handled the funds in question and solicited campaign contributions and made expenditures. Pet'rs' Reply to Pet. for Review and Response to Cross-Pet. for Review at 5. But it is the PDC's role as fact-finder to weigh the evidence and make determinations as it did here. We defer to such factual determinations. *See Hillis*, 131 Wn.2d at 396.

[7] While the plaintiffs asserted to the trial court that the PDC had been duped and that the trial court was not bound by the "PDC's exercise of prosecutorial discretion," there is no indication in the record that plaintiffs otherwise challenged the PDC report or objected to the report's admission and its consideration by the trial court. CP at 213. Plaintiffs first asserted that the PDC report was inadmissible in their reply brief to Division One. *See* Appellants' Reply Br. & Resp. to Cross-Appeal at 8. That is too late. *State v. Chen*, 178 Wn.2d 350, 358, 309 P.3d 410 (2013) (declining to address an argument raised for the first time in a reply brief); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (issues first raised in reply are too late to warrant consideration).

warrant deference because this is not a complex or technical inquiry, majority at 24-25; and (3) the PDC report was not an "agency determination [or action] to which courts must defer." Majority at 25-26. I disagree.

In my view, we should defer to the PDC report in this circumstance because there is no indication that the PDC in any way misapplied the FCPA. Nor is this a case in which the PDC failed to act or acted ultra vires. As noted, the FCPA grants the PDC authority to determine whether a violation of the FCPA has occurred and gives the PDC the option of holding a hearing regarding such determination or referring the matter to the AG. *See* RCW 42.17A.755(1)-(3). Here, the PDC referred the matter to the AG, who filed suit against the only entity that the PDC determined to be culpable, the BIAW subsidiary BIAW-MSC. This did not offend the FCPA and thus warrants our deference. *See Schuh*, 100 Wn.2d at 187 (reversing where trial and appellate court failed to give appropriate deference to agency expertise).

I also disagree with the majority's view that the PDC's resolution of conflicting evidence in reaching its determination does not warrant our deference. The majority oversimplifies the fact inquiry at issue as involving only who is identified by the term "BIAW" appearing in e-mails and meeting minutes, contending that such inquiry is not complex or technical and does not involve any particular agency expertise. Majority at 24-25. The point here is that the PDC's determination involved analysis of revenue reports as well as the consideration of other evidence including declarations and "interviews under oath" of organization personnel. *See* note 5, *supra*. That calculus,

10

which involved the assessment of financial materials, credibility determinations, and the weighing of all such evidence, not only informed the PDC's determination of culpability as to BIAW-MSC only, but reaching that determination necessarily resolved the question of fact that the majority says is raised here by the reference to "BIAW" in the noted documents. Under these circumstances, we should defer to the PDC's factual determination. *See Hillis*, 131 Wn.2d at 396 (judicial deference to agency views is appropriate when an agency determination is based heavily on factual matters close to the heart of the agency's expertise).

I also disagree with the majority's view that we can disregard the PDC report because it does not qualify as an "agency action." Majority at 26. As discussed above, the PDC may determine violations of the FCPA, and has the option of holding a hearing or referring the matter to the AG. *See* RCW 42.17A.755(1)-(3). The PDC pursued the latter option, and the AG filed suit against BIAW-MSC, all in compliance with the FCPA. Under the circumstances of this case, we should defer to the PDC report.

In sum, as discussed, the findings and determinations contained in the PDC report required the PDC to weigh the evidence presented and draw upon its expertise in reaching its conclusions. In doing so, the PDC determined that BIAW was not a political committee, but BIAW's nonprofit subsidiary, BIAW-MSC, had engaged in conduct that ran afoul of the FCPA warranting referral to the AG for further action. The trial court considered the PDC report and apparently deferred to it in granting BIAW's motion for

11

summary judgment. Such deference under the circumstances of this case was proper and should be echoed by this court as well. *See Hillis*, 131 Wn.2d at 396.

Conclusion

The events in question that prompted the citizen inquiry in this case occurred the better part of a decade and two election cycles ago. One plaintiff is now deceased. The concern that prompted the citizen letter that started this process and the gravamen of the citizen complaint has been addressed. The citizen letter to the AG was answered by a thorough PDC investigation that otherwise exonerated BIAW, but found grounds for further action against BIAW-MSC, which the AG pursued and which BIAW-MSC settled.[8] While a citizen suit in this case against the BIAW nonprofit association is not procedurally barred by the AG's action of forwarding the citizen inquiry to the PDC for consideration, the AG's subsequent filing of a lawsuit against BIAW's for-profit subsidiary renders an additional citizen suit against BIAW under RCW 42.17A.765(4) unavailable under the facts of this case. Additionally, the PDC determination of the factual question of BIAW's culpability in my view renders further citizen action to address that issue improper.

It is time for the parties to move on. In this case, the system (i.e. the statutory scheme of the FCPA as interpreted and employed by the PDC and AG) has worked as

---

[8]As part of that settlement, BIAW-MSC, the for-profit subsidiary of BIAW, agreed to register as a political committee and file all campaign finance disclosure reports to the PDC concerning campaign contributions it received in 2007; it agreed to pay hundreds of thousands of dollars in fines, and it agreed to pay hundreds of thousands of dollars more without court intervention in the event of any FCPA violation through 2016.

intended. Concerned citizens notified the proper authorities about questionable election activity. The agency with expertise in this area investigated, determined culpability, and recommended litigation action to the AG, which the AG pursued, resulting in settlement and correction of the actions that prompted the citizen letter in the first place. In my view, further litigation in this matter is not warranted. Judicial economy compels that we affirm the trial court's grant of summary judgment.

Madsen, C.J.